## Raison, et al. v. Raison, Extx.

(Decided May 1, 1912.)

### Appeal from Campbell Circuit Court.

1. Wills—What Not Evidence of Mental Unsoundness.—The fact that one believes in spiritualism is not an evidence of unsound mind.

2. Insane Delusion.—A belief founded upon evidence, however unsatisfactory that evidence may be to some other mind, which measures it to test its sufficiency, is not an insane delusion.

3. Wills—Influence of Occult Power—Evidence—Peremptory Instruction.—There being no evidence in the record showing that the will was written, or induced by the exercise of occult power, or that the gift was not the act of a sound mind, the peremptory instruction directing a verdict sustaining the will was proper.

4. Wills—Undue Influence.—It is well established that an influence sufficient to invalidate a will must be such as to destroy the testator's free agency and as to induce him to do against his will, that which he would otherwise not do.

C. T. BAKER for appellants.

L. J. CRAWFORD, CHAS. M. F. STRIGER for appellees.

OPINION OF THE COURT BY JUDGE WINN—Affirming.

Charles L. Raison, lately deceased, a member of the Campbell County bar, was twice married. By his first marriage he had two children, the appellants here. He was divorced from his first wife, their mother, in 1897. In August, 1900, he married Mrs. Anna E. Thomas, now Anna E. Raison, the appellee. On February 16, 1904, he wrote his will, by which he devised to Anna E. Raison a one-half undivided interest in his dwelling property in Newport, the other half interest in the property having theretofore been conveyed to the wife. He further devised to her all of the household furniture and other personal property then in this dwelling or that might be in it at the time of his death. He named her as his executrix. He did not devise any other property which he may have owned. He died in February, 1910. His two children by his first wife, the appellants, contested this will; and upon a trial had in the Campbell Circuit Court the trial judge directed a verdict, at the conclusion of contestants' testimony, sustaining the will. From a judgment upon that verdict this appeal is prosecuted.

The authenticity of the will is not questioned, nor is the testamentary capacity of Charles L. Raison seriously questioned. It appears that the testator was a man of fixed and determined purpose. His son, Thomas W. Raison, a surgeon in the United States Navy, testified that his father was a man of clear and vigorous mind up until his last illness, and that he was tenacious in his opinions, judgments and convictions. The only testimony in the record which might be argued as supporting any irrational condition of his mind was the established fact of his belief in spiritualism and in communion with departed spirits, a belief which he entertained as far back as 1897, some three years before his marriage to the appellee. It seems that his mother was also a firm believer in spiritualism.

The fact that one believes in spiritualism is not an evidence of an unsound mind. Many brilliant and well balanced minds are fixed in the belief that they can communicate with the spirits of those whose physical life has ended. The belief is a conviction commonly produced by evidence of some sort—not evidence perhaps that might appeal to the ordinary run of minds as satisfactory or as sufficient to establish a belief. A belief founded upon evidence, however unsatisfactory that evidence may be to some other mind which measures it

to test its sufficiency, is not an insane delusion. In the case of Schildnecht v. Rompf's Executrix, 4 S. W., 235, it was shown that the members of the testator's family were inclined to believe that certain persons possessed unnatural powers; but the court said that it could not be assumed that because the testator believed in the exercise of unnatural powers by others he was insane or incompetent to make a will. This is in line with practically all of the American authorities, which are well collected in a foot-note to the Indiana case of Steinkeuhler, et al. v. Wempner, et al., reported in 15 L. R. A., N. S., 673. It is not considered necessary to elaborate this discussion. It is proper to add, however, that the mind might become insane with spiritualism as its monomania, just as it might become insane upon the subject of religion, politics, business or any of the multitudinous subjects which engross the attention of the human intellect. It might well, too be said that if the will in question were shown to have been the result of some suggestion or direction supposedly drawn from some spiritualistic or occult source, so powerful in its influence as to destroy the testator's free agency and afterwards to cause him to do, against his will, what he otherwise would not do, the will would not be a will, because not the free and self-willed act of the testator. But the same observations which are applied to spiritualism in this respect would apply to any other force which might likewise cause the testator to do that which he would not otherwise do, in making his will. In the case at bar it is to be remembered that the testator's son, a contestant of the will, testified as to the father's vigorous mentality down to the time of his death. There is no evidence in the record showing that the will in question was written or induced by the exercise of any occult suggestion or power. In this aspect of the case, therefore, the peremptory instruction was proper.

Nor is there testimony in the record upon which the trial court would have been warranted in submitting to the jury the question of whether it were obtained by any undue influence. The appellee, Anna E. Raison, at the time of her marriage, was a medium, in the sense commonly applied to one who is supposed to be the intermediary between the living and the dead in spiritualistic manifestations or seances. She had advertised and held meetings attended by the public. Doubtless it was the fact of his mother's long-fixed belief in spiritualism

and of his own belief which first brought Mr. Raison into contact with the appellee. There is a good deal of evidence, direct and indirect, in the record tending to establish that his relations, prior to his marriage to her, assumed a nature distinctly otherwise than spiritual. He is reported to have been seen leaving her apartments, not wholly dressed, in the hours of the very early morning. She as well is said to have visited him in the privacy of his own bedchamber, in his own dwelling house, before he had apparelled himself for the day. It seems to be true as well that she was demanding money of him before their marriage, and that he feared that if he did not give it to her there would be an uncomfortable exposure of their relations. In the summer of 1900, however, he was married to her and took her into his home as his wife. His mother was then living there, as were his two children, the appellants, and two children of the appellee by a former marriage. As was naturally to be expected these different elements did not mold into a happy houshold. His daughter left and later his son. His mother also left, or was taken away at the instance of the appellee. The mother did not like the appellee, nor did the appellee like her. Practically all social intercourse was broken off between the family of Mr. Raison and his wife; though the father's relations toward his children remained always kind. Sundry members of his family testified upon the trial that in the household she was the dominant force and character; that he would not oppose her; and that he would conceal from her his business connections and somewhat of his social connection with the members of his family. It likewise seems that upon the occasion of Mr. Raison's last illness the appellee was not prompt and thoughtful in notifying his children of his condition, though she did so in answer to telegraphic inquiries sent when they had learned of his illness through other channels. Other testimony, particularly that of a brother of Mr. Raison, a physician then in confinement in the penitentiary of another State under conviction for a criminal abortion, tends to create the belief that after her marriage her conduct was not what it should have been. But the testimony of any undue influence in the execution of the will is wanting. Nearly four years after his marriage in 1900, the testator wrote his will; and he left it without change for six full years and down until the time of his death. He executed it at his office and called a couple

of his brother lawyers to witness it. It will be remembered that his own son said that he was a man of a strong will and mind of his own. It has been so repeatedly held and is so well established that an influence sufficient to invalidate a will must be such as to destroy the testator's free agency and as to induce him to do, against his will, that which he would otherwise not do, and that the influence must be one operating upon or influencing the testamentary act, that it is not worth while to do more than to recall the rule. The foregoing facts, some of which are not pleasant, have been put in the record only for the purpose of disclosing the farthest extent to which the appellants' testimony went. None of it was shown to have influenced the mind of the testator when he came to the solemn point in his life when he should make a testamentary disposition of his affairs and effects. In so far as the record discloses, that act was as free, as voluntary and as much his own as any other act in the testator's existence. Perhaps the sole exception to this general statement lies in the fact that the testator had stated that he had made a will leaving all his property to the appellee in order to satisfy her and to keep peace in the family; but that he had made another will, which was in his private box, providing for his children. The will in question more nearly measured up to the second will which he described than to the first; for it did not devise to the appellee all of the testator's property, but only his interest in the dwelling house and its contents. The record discloses, in a very general way, that he had other property, though the amount and value of it are not disclosed. This other property, whatever it may have been, passed under the laws of descent and distribution, and to that extent at least provided for his children. But testimony of this character is not sufficient of itself to establish that a will is the result of undue influence. Wall v. Dimmitt, 114 Ky., 923. It is admissible to show the mental condition of the testator at the time the will is made and his susceptibility to influence by which he was surrounded at the time; but it must be accompanied by some other evidence that the will was executed as the result of undue influence, before the case will be permitted to go to the jury. As above indicated, there is no other evidence here of this nature.

A considerable amount of testimony given in behalf of appellants was excluded upon the trial. It largely

consists of heresay and incompetent evidence. It consisted in part of testimony which, had it been supported by other testimony, would have been competent. Without detailing it, it is sufficient to say that it has been gone over carefully, point by point, and that no competent testimony in behalf of appellants was excluded.

The reading of this record inevitably results in a sympathy for the contestants and in a spontaneous feeling that the testator did not do for them as the average man might have done for his children. But will contests are not to be tried by our view as to what the testator should have done in any particular instance. The observations of this court in Childers' Executrix v. Cartwright, et al., 136 Ky., 498, apply with peculiar aptitude here, where, after remarking the dominating control of the mother over the father and her disposition to rule or ruin, it was said:

"The burden of showing that the instrument is invalid because procured by the exercise of undue influence is upon the contestants. This must be shown by evidence at least tending to establish that undue influence was exercised upon the testator. It is not sufficient that it be shown that there was an opportunity to exercise undue influence, or that there was a possibility that it was exercised; some evidence must be adduced showing that such influence was exercised. The law permits the owner of property, who is of sound mind and disposing memory, to transmit his property by last will and testament in such manner as pleases him, and juries are not permitted to make for him a will that accords with their ideas of justice and propriety; nor are they permitted to suspect away the right of the testator to dispose of his property in accordance with his own will and desire."

Mr. Raison ordered the manner of his life, his conduct and his associates. The property which he willed to his wife was his. It was his privilege to give it to her if he desired to do so, provided the gift was the act of a sound mind and the result of his own free agency. There was no testimony upon which the jury might have found otherwise, and the judgment is affirmed.