# Chesapeake & Ohio Railway Company v. Kornhoff.

(Decided December 14, 1915.)

## Appeal from Kenton Circuit Court
## (Criminal, Common Law and Equity Division).

1. Negligence—Interstate Commerce—Employers' Liability Act.—
An employe, engaged in work upon a turntable, which was owned
and used by a common carrier whose line of railroad extended
from one State over into and across other states, and the
turntable was being used in handling the engines engaged in
operating the trains and cars in interstate trips, as well as
those operating trains and cars on trips purely intrastate, was
engaged while so at work upon the turntable in the furtherance
of interstate commerce, if injured can bring suit under the Federal
statute known as the Employers' Liability Act.

2. Railroads—Interstate Commerce.—An engine of such carrier, after
having been detached from a train coming from another State in
Kentucky was, before being finally located at the place where
it should remain until demanded for another trip, run upon such
turntable for the purpose of being placed upon the track where it
should remain until again needed to be used in the carriers' busi-
ness. Held that such engine had not at the time it was upon said
turntable ceased its interstate journey, but was then engaged in
interstate commerce.

3. Evidence—X-Ray Photograph—Admissibility.—The introduction
before the jury of X-ray photographs purporting to show the
condition in which an injury left portions of the victim's body,
which conditions would without the picture be invisible, will, if
the proof shows that the one produced is a correct representation
of the injured portion, be admissible upon a trial for damages
on account of the injury.

4. Damages—Personal Injuries—When Verdict not Excessive.—
Where the evidence shows that the plaintiff was injured by
having an iron or steel bar about an inch in diameter and four
and one-half feet long to pass through his entire body injuring
the peritoneum, which was followed by peritonitis, and which
produced abrasions and bruises of the smaller intestines, pro-
ducing a permanent consequence of adhesion of the bowels, which
the proof shows, creates not only a present trouble, but that the
condition is absolutely incurable and is likely at any time to
result in serious affliction of the patient and in all probability
death; and it is further shown that a limb has become impaired

and reduced in size, and the foot thereon is permanently changed so as to assume a position of being nearly right angle to the body; and great nervousness, which did not theretofore exist, now prevails with the patient, it cannot be said as a matter of law that a verdict compensating the plaintiff for these injuries, as well as physical and mental pain, in the sum of $12,500.00 is so excessive as to require the court to set it aside on that ground alone.

GALVIN & GALVIN for appellant.

BYRNE & READ for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

The appelle, George R. Kornhoff, was an employe of the appellant railroad company as a general machinist, whose duties required him, upon direction of his foreman, to make repairs to any of the shop machinery, shafts, stationary engines, turntable, etc., belonging to the appellant and used by it in the conducting of its business as a common carrier, whether such machinery was located in Kentucky or other points into and through which the appellee's line of railroad ran.

On the morning of August 14, 1913, or just prior thereto, he was directed by one Mulcahey that some part of the running gear of the only turntable belonging to appellant, which was located in the city of Covington, was defective and needed repairing, and inasmuch as it would take something like two hours for the necessary repairs to be made, it was arranged that the appellee should be ready to and commence to make the repairs at one o'clock P. M. on that day, and it was understood between him and Mulcahey that the turntable would not be used before three o'clock on that afternoon. Accordingly, after the procuring of a helper, the appelle went into the pit, around which the turntable revolves, to do the work assigned to him. The impaired machinery of the turntable was beneath it, and in order to get at the work it was necessary for appellee to occupy a stooping position. One of the tools which it was necessary for him to use was what is denominated in the testimony as a chisel bar, it being a piece of steel about one and one-half inches in diameter and about four and one-half feet long. Within

a very short while after appellee had taken his position, and with another had commenced to use the tool described, the turntable was moved, and in such a manner that it caught this bar and caused same to penetrate entirely through the abdominal cavity of appellee. The place of entry was at the lower left side of the abdomen, and the place of exit being at the right side of the spinal column, passing through the ilium bone. He was carried to a hospital, where the bar was removed, and where he remained under treatment until November 7, 1913, when, for the first time, he was enabled to walk with the aid of crutches, and has continued to improve until now he is able to get about with the aid of a walking cane. On the 20th day of June, 1914, this suit was filed in the Kenton Circuit Court, whereby the appellee sought to recover from the appellant, under the act of Congress, known as the Federal Employers' Liability Act, the sum of $50,000.00, as compensation for his injuries and sufferings. The answer consisted of a denial and a plea of contributory negligence. There was also a plea to the jurisdiction of the court presented, upon the contention of appellant that the Federal Act under which the suit was brought did not confer jurisdiction upon the circuit courts of this Commonwealth in such cases, because under the procedure in this State a verdict may be rendered in such cases by a less number of the jury than the whole panel, and it is argued that this violates the seventh amendment to the Constitution of the United States, wherein the right of trial by a jury is guaranteed in all cases, where the amount in controversy exceeds $20.00, the argument being that the jury mentioned in the amendment referred to, must be a jury of twelve men, and that the Congress of the United States, therefore, had no power to confer jurisdiction upon, or permit, a case arising under the statute to be tried by any forum whose practice or procedure permits a verdict to be rendered by any number of the jury less than the whole, and this contention, together with other questions of practice and procedure, was insisted upon throughout the trial of the case. In disposing of this contention at the outset it may be said that this precise point was presented to this court for determination upon a petition for a rehearing in the case of Chesapeake & Ohio Railroad Co. v. Kelley's Administratrix, 161 Ky., 655. In the course

of that opinion, wherein this contention was denied, this court, *inter alia,* said:

"It will, however, be observed that this congressional legislation does not confer jurisdiction on State courts to hear and determine cases arising under the act; it merely recognized the existing jurisdiction of State courts, and to make plain this jurisdiction the act provides that, 'no cases arising under this act and brought in any state court of competent jurisdiction shall be removed to any court of the United States.'"

We do not feel called upon to re-argue the question in this opinion after its thorough consideration in the Kelley case, contenting ourselves by saying that the reasoning therein, upon the question being considered, still appears to us to be sound and logical, and we adhere to the ruling therein made. It might be added, however, that the Federal statute in question did not create a new cause of action which had not theretofore existed and an action thereunder did not become a new one upon the passage of the act subject to the exclusive jurisdiction of the Federal courts, but only certain rules of procedure, including the effect to be given to defensive pleas, which had theretofore been allowed, where changed or altered by the statute in question. It had immemorially been the law that the servant could recover compensation from the master for injuries negligently inflicted, whether the master or servant was engaged in interstate commerce or other business. And the various States of the Union had jurisdiction to try such cases although the business out of which the injury grew was interstate in its nature long before the congressional statute was enacted. It follows that the rulings of the trial judge upon this question throughout the trial of the case was proper. The trial resulted in a verdict in favor of the appellee for the sum of $12,500.00, upon which judgment was rendered, and the motion for a new trial being overruled, this appeal is prosecuted.

It is contended that neither appellant nor appellee was engaged in interstate commerce at the time the injury occurred. The facts upon this question are: that the appelle owns a line of railway running into Kentucky and across its borders into other States, including Indiana and some Eastern States, and that the turntable in question was the only one located in Covington, which was the end of a division of appellee's railway, and that

it was used constantly by the appellee in the handling of its engines engaged both in intrastate and interstate traffic. It might be stated that there was no article or instrumentality necessary in the conducting of appellee's business more constantly used than this turntable. The proof showed that the injury to appellee was produced by a servant of appellant attempting to move the turntable so that it might be used in reversing the position of an engine which had just completed an interstate journey from Peru, Ind., through Cincinnati, Ohio, into Covington. This engine had been detached from the train but in order for it to be moved into the roundhouse, there to remain until it was needed for another journey, it was necessary for it to be turned around in order to get into the round house upon the track selected for it. The testimony shows that after being detached from the train, some of the fire had been withdrawn from it, but it still held a sufficient amount of steam to propel itself in upon the turntable and from there into the roundhouse.

The argument is made that this engine had ended its interstate trip when it was disconnected from the train, and that it, therefore, ceased to be an appliance used in interstate commerce. We cannot agree with this contention. If the question hinged entirely upon the correctness of this position, the appellant could not succeed, because we are convinced that the engine at the time was still being used as an appliance in interstate commerce until it reached the location where it would remain until called upon for another trip or for other purposes, and its interstate trip was not ended until then. A like contention is also made with reference to the turntable being an article then used in interstate commerce, but under the authorities to which we shall hereafter refer, the unsoundness of this contention will at once appear, because it is adjudged by almost all, if not all, of both Federal and State courts of last resort, that any instrumentality used in the repair of, construction of, or adjustment of, any of the carrier's machinery or appliances, through and by means of which interstate traffic is carried on, are themselves articles of interstate commerce. A pertinent authority applicable to the question relating to the engine is found in the case of St. L. & San Francisco Ry. v. Seale, 229 U. S., 156. In that case the railroad company was engaged in both intrastate and interstate transportation, and it was the duty of the plaintiff

as yard clerk to examine incoming and outgoing trains, and to make and keep a record of their numbers, and the initials of the cars, and to check same and to make a record of the seals, as well as to label the cars for the purpose of placing them in outgoing trains, or upon the proper tracks for unloading, if they should come out of an incoming train. He was on his way to meet an incoming train from some point in the State of Oklahoma to a point in Texas, which was the terminus of its trip, and while on his way he sustained the injuries for which he sued. It was insisted by the railroad company that inasmuch as he was on his way to discharge his duties to a train which concluded its journey at that point and the movement of which train had already stopped, that the journey had ended and he was, therefore, not engaged in interstate commerce. In denying this contention, the Supreme Court of the United States says:

"In our opinion the evidence does not admit of any other view than that the case made by it was within the Federal statute. The train from Oklahoma was not only an interstate train, but it was engaged in the movement of interstate freight, and the duty which the deceased was performing was connected with that movement, not indirectly or remotely, but directly and immediately. The interstate transportation was not ended merely because that yard was a terminal for that train, nor even if the cars were not going to points beyond. Whether they were going further or were to stop at that station, it still was necessary that the train be broken up and the cars taken to the appropriate tracks for making up outgoing trains or for unloading or delivering freight, and this was as much a part of the interstate transportation as was the movement across the state line. McNeil v. Southern Railway Co., 202 U. S., 543, 559. See also Johnson v. Southern Pacific Company, 196 U. S., 1, 21."

The contention made as to the nature and character of the turntable, aside from what we have stated, is effectually disposed of by the Supreme Court of the United States in the case of Pederson v. Delaware, Lackawanna & Western Railway Company, 229 U. S., 146. In that case the injured plaintiff was a laborer for a railway company that was engaged in both characters of commerce, as was appellee herein, and at the particular time of the injury was engaged in the alteration and repairing of some of its bridges and tracks at

or near Hoboken, N. J. In carrying the tools with which he worked, he passed over a bridge of the defendant's track, and while doing so was run over by an intrastate passenger train. The work in which he was engaged was in taking out a girder of the bridge and inserting a new one. In denying the claims of the railroad company that the plaintiff was not engaged in interstate commerce, the Supreme Court uses this language:

"Among the questions which naturally arise in this connection are these: Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it? Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty resting upon the carrier? The answers are obvious. Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars, and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair. The security, expedition and efficiency of the commerce depend in large measure upon this being done. Indeed, the statute now before us proceeds upon the theory that the carrier is charged with the duty of exercising appropriate care to prevent or correct 'any defect or insufficiency * * * in its cars, engines, appliances, machinery, track, roadbed, works, boats, engines, wharves, or other equipment' used in interstate commerce. But independently of the statute, we are of opinion that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and in legal contemplation a part of it. The contention to the contrary proceeds upon the assumption that interstate commerce by railroad can be separated into its several elements and the nature of each determined regardless of its relation to others or to the business as a whole. But this is an erroneous assumption. The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged? See McCall v. California, 136 U. S., 104, 109, 111; Second Employers' Liability Cases, *supra*, 6, 59; Zikos v. Oregon R. & Navigation Co., 179 Fed. Rep., 893, 897, 898; Central R. Co. of N. J. v. Colasurdo, 192 Fed. Rep., 901; Darr v. Baltimore & O. R. Co., 197 Fed. Rep., 665; Northern Pacific Ry. Co. v. Maerkl, 198 Fed. Rep.,

1. Of course, we are not here concerned with the construction of tracks, bridges, engines or cars which have not as yet become instrumentalities in such commerce, but only with the work of maintaining them in proper condition after they have become such instrumentalities and during their use as such. True, a track or bridge may be used in both interstate and intrastate commerce, but when it is so used it is none the less an instrumentality of the former; nor does its double use prevent the employment of those who are engaged in its repair or in keeping it in suitable condition for use from being an employment in interstate commerce."

We endorse the reasoning of that court in each instance, as well as the conclusions which it reached, but were we inclined to take a different view, we would not be permitted to do so because we are bound by the interpretations of the statute given to it by that court.

During the progress of the trial the plaintiff introduced as evidence an X-ray picture, showing the condition of the ilium bone, through which the instrument that penetrated the body of the appellee passed in making its exit, after it had knitted and nature had exhausted its process of restoration, showing the condition in which it will permanently remain. To bring out more fully and to develop more perfectly the picture, the witness was permitted to place same in a contrivance designated as an illuminator, which witness explained served the purpose of giving a more accurate view of the object photographed. To the introduction of this testimony vigorous complaint is made by counsel for appellant. The purpose of all testimony is to place before the court and the jury the facts. They are entitled to know and consider any fact which will throw light upon the matter being investigated. The condition in which any part of the body of plaintiff was made by the injury they were entitled to know. The process of producing X-ray pictures is one of comparatively modern invention, but it has been found to be of great use and benefit in making scientific investigations by reason of the fact that it develops and shows the condition of the objects which would otherwise be invisible, and if, by its use, the opaque obstruction can be removed and rendered transparent, showing the real condition of the object beyond, it is difficult for us to see wherein the testimony would be irrelevant. Things which are external and can be seen with

the naked eye, such as scars, etc., are always admissible, and if science has come to the rescue of the deficiencies of the naked eye and enabled it to discern with substantial accuracy that which before was a matter largely of conjecture, even with the expert, we can discover no reason why the jury should be deprived of the assistance which the invention affords. This court accepted the relevancy of photographs of plain and unhidden objects in its opinion in the case of Bowling Green Gas & Light Co. v. Dean's Extx., 142 Ky., 678, and in disposing of the objection therein made to the introduction of the photographs showing the situation of decedent's body after being electrocuted, as well as the pole upon which it rested, said:

"Some time after the injury, a photograph of the telegraph pole and wires, with a man on the pole in the position Dean was at the moment he received the shock, was taken, and this photograph, over the objection of appellant, was introduced as evidence for the appellee. It is insisted that the admission of this photograph was error, especially because it showed a man on the pole intended to represent Dean, although it is not claimed that the photograph does not correctly represent the scene of the injury or the position of Dean was in. There can be no doubt that witnesses who were present when Dean was injured, and who saw where he was and the position he was in, could have described to the jury his attitude, the situation of the wires, and such surrounding objects as would throw relevant light on the matter being investigated. This being so, we are unable to perceive why a correct photograph of these objects and things would not be permissible as evidence. In the trial of cases, like this, it is important that the jury shall have as clear an understanding of the situation as can be furnished, and relevant information may be conveyed to them by pictures or models that they can see and examine or by the words of witnesses who describe the conditions as they existed."

In that case the objection was more tenable than if it had been made to a photograph of the body of decedent, taken before its removal, because a body had to be supplied upon a pole and to be adjusted after the manner described by witnesses to the accident. Still, as shown, the photograph thus taken was admissible, and for a greater reason would it have been admissible if it

had been taken immediately after the accident and before the removal of the decedent's body. If such testimony is admissible for the purpose of enlightening the juries concerning objects and scenes which any witness who saw them can describe, a fortiori, would it be competent to permit the introduction of photographs of objects which would otherwise be indiscernible, but this question has been put to rest by this court in its opinion in the case of C., N. O. & T. P. Ry. Co. v. Nolan, 161 Ky., 205. It was therein held that the introduction of this character of testimony was proper, it giving the jury a better and clearer understanding of what the picture represents than could be obtained by a verbal description. This character of testimony was also considered as relevant in the case of Ligon v. Allen, 157 Ky., 101.

Complaint is made of instructions given and refused upon the trial. The objections to the refusal of many of the instructions offered by appellant have been heretofore disposed of by us in the questions considered, but it is urgently pressed upon us that the court should have given to the jury instruction "C," offered by appellant, which is in these words:

"The court instructs the jury that if you believe from the evidence that the plaintiff went down under the turntable described in the proof before one o'clock, and that he was injured by the moving of said turntable before one o'clock, then that they must return a verdict for the defendant."

This instruction in the form offered is subject to the criticism of calling the attention of the jury to specific parts of the testimony, a practice always condemned by this court. But, aside from this, the appellant obtained the benefit of this feature of its defense being presented to the jury by instruction No. 1, which the court gave on its own motion. The jury were told, substantially, by the instruction so given that they could not find for the plaintiff unless the appellant through its servants "caused or permitted said turntable to be operated or moved when they knew or by the exercise of ordinary care could have known of the presence of plaintiff in the pit of said turntable," and in a subsequent clause thereof the jury were told that if "the employes in charge of the operation of the turntable did not know, and by the exercise of ordinary care could not have known, of the presence of plaintiff in the pit of said turntable when

they caused or permitted said turntable to be moved, at the time referred to in the proof, then you will find for the defendant.'' According to the theory of appellant, it had no knowledge of the presence of appellee in the pit at the time the turntable was moved because it had been agreed that he should not go into it until after one o'clock, and unless appellee violated this understanding and went into the pit before one o'clock, then in that event, the appellant, through its agents or servants in charge of the operation of the turntable did not know, nor could have known of the presence of appellee in the pit at the time the turntable was moved before one o'clock, unless such agents or servants saw and observed appellee when he did go into the pit for the purpose of doing the repairing, in which case it would have been the legal duty of such agents and servants not to have moved or attempted to move the turntable, notwithstanding appellee's negligence in violating his instructions as to the time when he should commence the work. And if, for no other reason, instruction ''C'' is properly refused because it ignored the duty which appellant's servants owed to the appellee, after having actual knowledge of his situation. We are aware of the rules many times announced by this court, to the effect that if an instruction is offered upon a subject entitled under the pleadings and proof to be submitted to the jury, it is the duty of the court to properly instruct the jury upon that subject, although the one offered is defective and should be refused. But no such state of case exists here for the reasons stated in considering instruction No. 1. Objection is also urged because of the failure of the court in giving the instruction on the measure of damages limiting the amount to a lump sum which would represent the present cash value of what his entire damages might be throughout the period of his permanent injuries, growing out of the reduction of his power to earn money if the same should be paid to him in monthly installments throughout that time; or, in other words, that the amount should be such a sum that if placed at interest would be wholly consumed by the time for which he was given damages should cease. In disposing of this it is sufficient to say that this question was thoroughly considered and the contention denied in the opinion of this court in the case of C. & O. Ry. Co. v. Dwyer, 162 Ky., 427, and we

do not deem it necessary to reiterate the reasoning therein made.

Other objections to the instructions given and refused are not seriously urged and we find nothing in them constituting prejudice to the substantial rights of the appellant.

Lastly, it is urged that the amount of damages returned by the jury is excessive. It is the rule in this State that unless "the damages should be so great as to strike the mind at first blush as having been superinduced by passion or prejudice on the part of the jury," the judgment should not be reversed upon this ground alone. This court has often refused to order a new trial when verdicts, even larger than the one in the instant case, were charged as being excessive, and this, too, when the facts as to the suffering and injuries of the plaintiff were not so aggravated as we find them to be in this case. The appellee is entitled to recover compensation for both physical and mental agony, and one can scarcely imagine an injury that would produce much more of either physical pain or mental anguish than that which the plaintiff endured on account of the injury which he received. The miracle is that he is alive to tell the story. In the language of one of the physician witnesses, "his recovery was a surgical curiosity." The testimony showed not only the injuries hereinbefore stated, but in addition, that his intestines, while not punctured, were bruised in more places than one, according to all of the testimony given by the physicians who testified on both sides. This necessarily produces adhesion, thereby impairing them from performing their natural functions, which impairment, under the testimony, has already produced obstinate constipation, and is liable at any time to produce an aggravated case of constipation, known as locked bowels, resulting, in all probability, in the death of appellee. His right leg, on account of the healing of the bone fastening the tissues of some of the muscles thereon, has become impaired so that appellee cannot turn his foot inward and must go throughout life with that foot projected toward a right angle to his body. The injury also produced an atrophied condition of the muscles, and the limb is emaciated and shriveled and rendered considerably smaller than the other one. The appellee has also, according to the testimony, been rendered nervous to such an extent that the slightest noise produces great

annoyance to him. It is shown that he was thirty-five years of age and was earning at his trade from $100.00 to $125.00 per month. Other resulting injuries not necessary to enumerate have been shown to exist as a consequence of the injury.

Under previous rulings of this court, and the rule herein recited, and the testimony in this case, while we might not have rendered a verdict so large, yet we can not say that the jury violated its prerogative in returning the one made. Perceiving no error prejudicial to the substantial rights of appellant, the judgment is affirmed.