## Compton et al. v. Smith et al.

April 22, 1941.

180

Joe S. Garman and Rodes K. Myers for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

A. C. Compton died in Warren County, Kentucky, on April 13, 1939. He left a writing dated March 3, 1939, purporting to be his last will and testament, which was admitted to probate by the Warren county court, over the objections of the contestants who are the appellees in this appeal.

In August, 1939, appellees appealed from the county court order of probate by filing their petition in the Warren circuit court in which they alleged that at the time of the execution of the writing, or alleged will, and sometime previous thereto, Compton was of unsound mind and also that he was under the influence of certain persons who were beneficiaries of the purported will and that same was procured by undue influence. The answer was a traverse only, thus completing the issues, and a jury trial resulted in a verdict finding the writing not to be the last will and testament of Compton. From the judgment entered upon that verdict the appellants have prosecuted this appeal, insisting upon a reversal of the same upon the grounds (1) that the evidence is in-

sufficient to sustain the verdict, and (2) the court erred in refusing to give certain instructions offered by appellants. We will consider the points in the order named.

The appellants, propounders of the alleged will, offered proof to establish its execution which seems to have been regular. The contestants then offered numerous witnesses to establish that at the time of the execution of the writing and for sometime prior thereto, A. C. Compton (also referred to in the record as "Clate") was not possessed of sufficient mind and memory to make a rational survey of his estate, to know the objects of his bounty, and to dispose of his estate according to a fixed purpose of his own.

It appears that the deceased, Compton, had lived in the home of George Bracken for about four and one-half years but he left the Bracken home about the 25th of January, 1939, previous to his death and went to the home of his niece, Maude Whittle, and her husband, Ed Whittle, where he resided until his death. It appears that Compton had executed a will five or six years previous to the execution of the alleged will in question, which was revoked by the latter, and the two writings were practically the same except the appellants, Whittles, received about $6,000 more of Compton's estate under the last alleged will than they would have received under the previous one. It is shown that the total value of the estate was approximately $10,000. There is considerable evidence to the effect that Maude Whittle solicited Compton to leave the Bracken home and go to her home and live with her. One witness testified that Compton said that Maude was wanting him to go live with her but that he did not want to do so because he could not get along with her.

Mrs. Lloyd Smith, a niece of Compton, testified that she saw her uncle frequently before he left the Bracken home and went to the Whittle home and talked to him and was acquainted with his condition before and after he went to the Whittle home. She said she observed a great change in him after he went to the Whittle home; that the change in his conversation and walk was noticeable, and that he would start talking about something and it would suddenly leave his mind and he would never finish the subject and start talking about something else.

She said she visited her uncle in the Whittle home four or five times within the few weeks he was there just previous to his death, and that he was taking some sort of medicine, the nature of which she did not know, but he took it at frequent intervals. She said a conversation occurred between her and the members of the Whittle family in regard to the medicine Compton was taking, and stated the conversation in this language:

"Well, they just said he would take his medicine and then he wouldn't remember taking it, and would ask them if he had taken his medicine, and they would tell him he had, and he wouldn't believe it and would take his medicine again. I just made the remark, 'Why don't you see the doctor and find out when his medicine is due and see that he gets it at the proper time.' They said, 'Oh, well, he wouldn't remember when he did take it or when he didn't take it.'"

John Moltenberry, who was no kin to any of the contesting parties and apparently disinterested in the result of the litigation, testified that he had been a close and intimate friend of Compton for about thirty years and that they had visited each others' homes at least once a week and went on fishing and hunting trips together practically every year. He said that in 1934 while he and Compton were on a fishing trip, Compton suffered a stroke and complained of a roaring in his head and of his hearing and eyesight being affected, and further said: "From that time on, he was a changed man." He further said that while Compton was at the Bracken home he observed a change in his conversation and conduct; that he would start talking on some subject and then walk off, or change to another subject, and that this condition continued to grow worse. He said that after Compton moved from the Bracken home to the Whittle home he visited him on a few occasions and that some member of the Whittle family would always be present and he was never permitted to be with Compton alone. After stating his association with and observation of Compton for thirty years, and particularly his mental attitude after he had the stroke in 1934, he expressed the opinion that on March 3, 1939, the date of the execution of the alleged will, Compton did not possess sufficient mind to execute a will. Also, Mrs. John Moltenberry, who had known Compton for eighteen

years, testified that she had noticed a considerable change in him in the last year previous to his death. She detailed the changes she had noticed relating to his walk, talk and conduct in general along the same line as that testified to by Mrs. Lloyd Smith and John Moltenberry. Earnest Williams also gave similar testimony. L. M. Skaggs testified that he had known Compton for thirty-eight years and during the last year of his life he had noticed considerable change in him. He said that Compton had known him and his father and mother since he, Skaggs, was fourteen years old, but Compton would not recognize him when he saw him, which was on frequent occasions, and would inquire on each occasion who he was and who his father and mother were, and after explaining to him the family relation, etc., Compton would say ''Now I believe I recognize you.''

Mrs. B. R. Compton, wife of a half-brother of the deceased Compton, testified that she had noticed that a considerable change had come over Compton sometime previous to his death. She said that Compton told her that he had talked to her son who had been dead for twenty-five years and on one occasion, a few months before the will was written, Compton said:

> ''I was talking to Eddie, and he would say, 'Uncle Clate, this is an awful good place here. It's lots better than there. We go to Sunday School and church, and it's just an awful good place.' ''

George Bracken, with whom Compton had previously lived, testified that he had noticed a change in Compton for the last two years; that he had talked to himself at nighttime and changed from one subject to another without completing any one subject and claimed that he talked with the dead on the telephone, and on one occasion he claimed that he had talked with the late Tommie Thomas, former attorney of Bowling Green, and Thomas asked him to give a message to his brother; that he also imagined that he had talked on the telephone to Tom Potter, deceased; that on one night he told Bracken to play the radio and that he was going to lie down because his mother would be there that night and he wanted to talk to her, and he then imagined that she was there in the room with him; also claimed that he had received letters from the dead. He said that Compton indulged in this kind of conduct on frequent

occasions for about a year before he was moved from the Bracken home to the Whittle home. He further said that Compton was frequently taking pills out of a large bottle and took at least twenty a day. The witness expressed the opinion that for some several months before Compton left his home he did not possess sufficient mind to make a will and that he also saw him at the Whittle home and that his condition had grown worse.

A large number of witnesses, including bankers, business men, doctors and people of various classes, testified in behalf of appellants and their evidence standing alone tends to show that Compton was mentally competent to execute a will. However, one witness admitted on cross-examination that he thought Compton "was a little crazy." This statement was made after the witness had detailed his acquaintance with and observation of Compton for sometime previous to his death. The expert or professional testimony of two or three doctors is somewhat favorable to the propounders of the will. However, one doctor testified that the tablets or medicine which Compton had been taking, which was identified by the label on the bottle produced in court, were such that their effect on a person would range from little or no effect to acute insanity, depending upon the individual's susceptibility to the drug. In answer to a hypothetical question based upon the testimony of the witnesses for appellees, Dr. Funk expressed the opinion that Compton was incapable of executing a will on March 3, 1939. Other doctors as well as other witnesses for appellants testified that they observed nothing wrong with Compton's mind.

It is insisted for appellants that momentary forgetfulness and belief in spiritualism is not evidence of insanity. It may be true that momentary forgetfulness or lack of strict coherence in conversation to a reasonable extent is not evidence of mental derangement or lack of mental capacity. It appears, however, that Compton's case was an extreme one. It is apparent from the evidence of a number of witnesses that Compton was so destitute of memory that he could not carry on an intelligent conversation and was incapable of concentrating his thoughts on any particular subject. And, it is likewise true that a normal belief in spiritualism is not evidence of insanity, unless such belief is possessed to the extent that it destroys the will power and overcomes

it (Raison et al. v. Raison, Ex'x., 148 Ky. 116, 146 S. W. 400), or indulged in to such an extent as to indicate insane delusions.

It is pointed out in the Raison case, supra, that the only evidence in that record which might be argued as supporting any irrational condition of Raison's mind was the fact of his belief in spiritualism and in communion with departed spirits. But that opinion does not disclose the method of communion with departed spirits believed in by Raison, whether by intangible spiritual means or by physical or material means. In the present case the undisputed evidence shows that Compton believed that he could write letters to the dead and receive letters from the dead and also talk to the dead over the telephone and that the dead talked to him by the same means.

In Nalty's Adm'r v. Franzman's Ex'r, 221 Ky. 709, 299 S. W. 585, it is held that evidence of insane delusions and abnormal beliefs about any religion is competent evidence on the question of testamentary capacity and, while belief in spiritualism is not proof of testamentary incapacity, it does not follow that insane delusions based upon spiritualism are not competent as evidence to establish lack of testamentary capacity. It is our view that a belief in communication with dead people by letters and telephone and other physical and material means goes beyond a normal belief in spiritualism. The words "spiritualism" or "spirit" would indicate that such communication, if at all possible, would be by spiritual inspirations through a higher power rather than by natural or physical materials, such as letters and telephones invented and controlled by man. If Compton believed in spiritualism, it appears that such belief was carried to such an abnormal and unusual extent as to indicate insane delusions, though perhaps based upon spiritualism.

Furthermore, the alleged belief of Compton in spiritualism, if it should be classed as such, is not the only evidence of mental incapacity. There is other evidence sufficient for the jury's considertaion which might indicate a lack of sufficient mental capacity to execute a will. If it be conceded that no one particular instance or item of evidence standing alone would be proof of mental incapacity, yet, once all the facts and attendant

circumstances are considered as a whole, we think the evidence is amply sufficient to support the verdict.

This brings us to consideration of the court's refusal to give certain instructions offered by appellants. The instructions given are not complained of as being incorrect so far as they go, but it is insisted that the court should have given appellants' offered instructions on undue influence and spiritualism. Undue influence was one of the grounds of contest of the will relied on by appellees, but the trial court did not deem the evidence sufficient to warrant instructions on that issue and, therefore, submitted the case to the jury upon the sole question of Compton's mental capacity to make a will. We agree with the trial court that the evidence relating to undue influence was sufficient only to show an opportunity on the part of appellants to exercise undue influence over Compton and, perhaps other circumstances sufficient to raise a suspicion that he might have been unduly influenced in the execution of the will. But, since there is no evidence of substance sufficient to take the case to the jury on that question, it follows that the court did not err in failing to instruct the jury on that issue. Ellis v. Ellis, 104 Ky. 121, 46 S. W. 521, 20 Ky. Law Rep. 438.

Lastly, it is insisted that the court should have given instruction "C" offered by appellants, which reads: .

"The Court instructs the jury that belief in spiritualism is not sufficient in law to create a lack of mental capacity on the part of the testator, to the extent that he was not competent to make the will testified about in this case, unless such belief was possessed by him to the extent that it destroyed his will power and overcame it, and caused him to execute the paper, and but for which he would not have executed it."

It is the established rule that an instruction should not be given calling the attention of the jury to specific testimony or to single out a specific item or phase of the evidence. The jury should be permitted to consider all the evidence as a whole without being bound by an instruction giving prominence to any particular phase or part thereof. Chesapeake & Ohio Railway Company v. Kornhoff, 167 Ky. 353, 180 S. W. 523; Greenway et al. v. Watson, 268 Ky. 745, 105 S. W. (2d) 848; Coombs

Land Company v. Gross et al., 216 Ky. 648, 288 S. W. 289.

If it was proper for the court to give an instruction on the particular phase of the evidence relating to Compton's alleged belief in spiritualism, then it would have been proper to have instructed the jury on all other items or phases of the evidence. For instance, the degree or extent of the effect on Compton of the alleged stroke he suffered in 1934; the extent of his alleged forgetfulness, incoherence, and inability to engage in conversation, and the effect, if any, the alleged excessive use of the medicine he had been taking. It follows that the court did not err in rejecting the offered instruction.

Finding no error prejudicial to the substantial rights of appellants, the judgment is affirmed.