## Snyder et al. v. Rhinehart et al.

(Decided June 17, 1938.)

J. B. SNYDER and B. B. SNYDER for appellants.

T. E. MAHAN and E. L. STEPHENS for appellees.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Reversing.

On October 26, 1936, J. B. Snyder, his brother, B. B. Snyder, and their three sisters, all five of whom we shall hereafter refer to as "The Snyders," sued Grant Rhinehart in equity upon two vendor's lien notes. They were only partially successful and they have appealed.

The older note, which we shall call "Note A," was for $100.00. It was dated April 18, 1932, became due January 1st, 1933, was to bear 6% interest after its maturity, and states that it is "secured by a lien on land." The proof shows that the following payments have been made thereon: May 5th, 1933, $50.00; Oct. 30, 1933, $3.00; Sept. 27th, 1934, $3.00; and Oct. 3, 1935, $3.00.

This "Note A" is described in a deed dated April 20th, 1932, which we shall call "Deed A", hence it is a statutory lien upon the land "The Snyders" undertook by that deed to convey to Grant Rhinehart. See section 2358, Kentucky Statutes. That land is thus described in that deed:—

"Beginning on a stake on Cumberland River near a hollow, thence a N. E. course passing a walnut tree on top of the bank about 160 feet to the Public County highway where a drain crosses the road, thence up the river with lower side of County road about 400 feet to a drain across Sally's branch where it empties into Cumberland river; thence with the drain a southwest course about 75 feet to,

Cumberland river, thence down the river with its meanders to the beginning. Containing about ¾ acre; first parties reserve the right to use water out of the well that is now on this land if they or any of them build a house on lands near thereto or for water for their stock on lands adjoining this tract."

The second note which we shall call "Note B" is dated July 27th, 1932, is for $50.00 due one year after date, bears 6% interest from date, recites that it is "secured by lien on land retained in deed", and the proof shows these payments have been made upon it, Oct. 30, 1933, $3.00; Sept. 27, 1934, $3.00; Oct. 3, 1935, $3.00.

"Note B" is described in a deed dated July 15th, 1932, which we shall call "Deed B", hence it is a statutory lien on the land described in that deed, which is:—

"Beginning on the N. E. corner of lot heretofore sold to the second party, and adjoining same at a culvert under the highway, thence along the lower property line of the Pineville-Williamsburg highway a S. W. course, 108 feet to a St. and stone in edge of highway property line and near second party's house. Thence S. E. course 40 feet in line with two sycamores and bank of river to a St. and stone; thence easterly course 108 feet crossing a hollow to second party's line st. Thence 40 feet with his line to the beginning to culvert, lower edge of highway. *The deed heretofore made to second party calling for a walnut on bank of river is hereby corrected, as a Locust instead of a Walnut, and should read from Locust near a drain to culvert at Highway.*"

## Credits on Notes.

There is a dispute about the credits that should be on these notes. Rhinehart produced these three receipts for interest, each of which is signed by B. B. Snyder:

"Received of Grant Rhinehart $6.00 Interest two $50.00 notes. Oct. 28, 1933."

"Received of Grant Rhinehart $6.00 interest on notes, heretofore having paid $6.00. Sept. 28, 1934."

"Received of Grant Rhinehart, $6.00. Interest on Note, Oct. 3, 1935."

One dispute is about how much credit should be placed on these notes because of the receipt dated Sept. 28, 1934. B. B. Snyder testifies that Rhinehart told him he had lost a receipt and he wrote this receipt in the way he did, to cover this payment and the payment made Oct. 28, 1933. Rhinehart denies having lost a receipt or that he had told B. B. Snyder he had lost a receipt. Rhinehart insists he made two payments of $6.00 each on these notes in 1934, but he is unable to fix the date of the first one of these. B. B. Snyder denies there were two payments made in 1934. The weight of this evidence is about equal. Rhinehart had the burden of proving his payment, he has not sustained it and $6.00 is the only credit to which he was entitled on account of this receipt. The other $6.00 described as theretofore paid referred, so we hold, to the payment of Oct. 23, 1933. We fixed the credits as we did on these notes, supra, these three $6.00 payments being divided and three credits of $3.00 each placed on each note.

### The Counterclaim.

Grant Rhinehart and his wife, Myrtle Rhinehart, in their answer and counterclaim filed January 13, 1937, admit that Grant Rhinehart executed these "Notes A and B", and received from "The Snyders", "Deeds A and B", but they contend the property conveyed by "Deed B" was in fact a part of the property previously conveyed to Rhinehart by "Deed A", and that the signature of Rhinehart to "Note B" was obtained by fraud, etc A sharply defined and a bitterly contested issue was developed as to what was the property included in this first deed. That description is somewhat indefinite and confusing and after careful study of it and the evidence contained in this record we have found what we are sure is the property conveyed by "Deed A". We shall now give our conclusion and later shall state why we came to that conclusion.

### Property Conveyed By Deed A.

Beginning at a stake in the mouth of Sally's Branch where it empties into Cumberland River from the west, right as you look down the latter stream; (a) thence running up Sally's Branch N. 36, W. 75 feet

to where it is crossed by the Pineville and Williams-
burg Highway; (b) thence with the eastern line of said
highway S. 30, W. 118 feet to a stake on the eastern
side of said highway; (c) thence again with eastern line
of said highway S. 41, W. 219 feet to where a drain
passes under said highway; (d) thence leaving the high-
way and running S. 56 E. (passing a few feet west of a
locust on top of the bank at 132 feet) about 160 feet all
told to a stake on the right or western bank of the Cum-
berland River, near a hollow; (e) thence with the west-
ern or right bank of the Cumberland River up stream
with the meanders of the river to the beginning con-
taining three fourths (¾) of an acre.

### Reasons for This Conclusion.

In preparing the above as the correct description
of the property conveyed by "Deed A", we began at
the mouth of Sally's Branch because that was one cor-
ner upon which everyone agreed. The length course
and distance of line (a) N. 36, W. 75 feet is undisputed.
Now the dispute begins relative to the length of the
lines (b) and (c), along a paved highway to the first
drain under and across it south of Sally's Branch. Two
engineers measured the distance southwest from Sally's
Branch along this paved highway to the first drain that
passes under the highway. Mr. Whitehead, an engineer
of six years' experience, measured this distance along a
straight line between these two points and he showed
on his map and testified in court it was 288 feet. Other
witnesses who were along with him testify to this dis-
tance but it is perfectly apparent they were merely
repeating what they had learned from Whitehead when
he was doing this surveying.

Another engineer, Mr. T. Y. Beard, who has been
engaged in surveying for 25 years, testified and made
and filed a map showing the distance from Sally's
Branch to this first drain under the highway to be S.
30, W. 118 feet and S. 41, W. 219 feet. Then adding
these two measurements 118 and 219 we have a total
distance of 337 feet which is just 49 feet more than the
288 feet testified to by Whitehead. Both those state-
ments cannot be true. The idea of two different men
measuring between the same points, one reporting the
distance to be 337 feet and the other that it is only 288
feet is preposterous. We are sure this error of 49 feet
occurred in this way. Whitehead was using a 50-foot

steel tape in making his measurements, so the evidence shows. We are sure he miscounted the number of tape lengths, thus making an error of 50 feet. Since these parties may not have started from exactly the same point an error of one foot may have been made in that way, and thus we have a 50-foot error reported as 49 feet of difference in these two measurements. If Whitehead made an error in his measurement, then the testimony of the witnesses who were with him was merely a repetition of that error. None of them claimed they measured this distance themselves. We are satisfied there is a curve in this road just as Beard testified, because Whitehead testified his chain carriers went through a brier-patch in running his line. We are sure these briers were not growing in this paved highway and that Whitehead's survey was a piece of carelessness.

Mr. Whitehead apparently did not care about this difference of 49 feet, but Mr. Beard did care, and he went back out to the property to re-check his measurements. Mr. W. J. Moore had been doing surveying in Whitley County for 40 years as he testified. He was a surveyor introduced as a witness by Mr. Rhinehart's counsel. He went with Mr. Beard when he went out to re-check his survey, and after they came back he agreed with Beard, said the line along the highway had a crook in it, that it was 118 feet to the curve, 219 feet from there to the first drain under the highway, and 148 feet from there, or a total distance of 485 feet to the second culvert or drain under the highway to where Rhinehart claimed the corner was.

Rhinehart is continuously harping about being defrauded and cheated out of his land, so we will make a simple calculation. The figure produced by drawing the description we have prepared is practically a trapezoid with two of the angles included between the parallel sides, practically right angles. One of these parallel sides, line (a), is 75 feet, the other line, (d), is 160 feet, adding these and dividing the sum by 2 we have an average perpendicular of 117.5 feet. We will accept for the purpose of this calculation Whitehead's measurement of the base, or 288 feet, though we know it is too short, and multiplying 117.5 by 288, and dividing the result by 43560 will give us point seventy-five (.75) plus. This shows that in no phase of the case can it be shown that Rhinehart has not got his ¾ of

an acre. By a similar calculation using 337, the true distance as a base, we find the area of "Tract A" to be .909 plus acres. Moreover, since Rhinehart bought this land, he gave, so he says, a strip along the N. W. side to the county and the county paid him $25 just for the corn then growing on it, so we are sure this "Tract A" once contained perhaps an acre or more.

### Deed B.

As soon as Mr. Rhinehart got his deed for "Tract A", he bought some lumber, hauled it out and began the erection of a house. Mr. B. B. Snyder went to see him and explained to him that he was building this house southwest of the line of the property conveyed him and on the property of "The Snyders". The work on the house was stopped and negotiations started for the purchase of additional property. These negotiations resulted in Rhinehart's purchase of an additional tract, and the execution of "Deed B" and "Note B", supra. An examination of what we have copied from "Deed B", supra, will show that by it the parties did more than make a conveyance of additional land. By the 37 words we have copied from it and italicized the parties erected a written memorial modifying "Deed A", by correcting the description in it and definitely settling the very matter they are litigating about now. When "Note B" and "Deed B" were signed and delivered there were four solemn contracts outstanding between these parties. "Note A" for $100. "Deed A" conveying Rhinehart ¾ of an acre of land. "Note B" for $50 and "Deed B" conveying Rhinehart additional land and correcting the description in "Deed A".

### The Counterclaim.

When Rhinehart was sued by "The Snyders" on "Notes A and B" and the court was asked to enforce the statutory liens on the property described in "Deeds A and B", Rhinehart asserted as a counterclaim that "Deed A" covered all the land that had been conveyed him by "Deed B" and more besides. In their answer and counterclaim the Rhineharts asked the court to cancel the deed of July 27, 1932, "Deed B" and the $50 note, "Note B", dated July 27, 1932, and that all the payments made on "Note B" be applied as credits on "Note A". The basis of their claim is that this "Tract A" instead of stopping at the first drain under the high-

way after leaving Sally's Branch and starting southwest should continue to the second drain under the highway and run thence across to Cumberland River. To award Rhinehart this tract as the trial court did would give Rhinehart a much larger area as his first purchase than ¾ of an acre. In fact, it would give him over an acre and ¾. Rhinehart contends now that that was what he claimed all the time and that his boundary along this road should continue west to this second drain, a distance of about 490 feet. That matter was fresher in Rhinehart's mind in 1932 when this second deed was made than it is today, but he claims Ben Snyder defrauded him in his representations that his deed ended at this first drain under the highway, but we will look at Rhinehart's evidence and will see what he testifies about that.

He says when asked why he entered into the second deed that he did so, because:—

"I wanted to do justice to him, if he had made a mistake. I seed when I looked in the deed, I seed it wasn't a mistake, it was an absolute fraud, trying to fraud me out of everything I had." He further testified: "Did you know he was honestly mistaken or dishonestly mistaken at that time? A. I knowed when I read the deed he made a dishonest mistake for his own * * *". At another place in his evidence he says: "I told Ben right here in town I wasn't going to pay that note, and I told Ben that I wasn't going to put that deed on record, because I knowed it was a fraud and I never put it on the record. It is a fraud." At another place he said: "When I signed the note I seen it was an absolute fraud", and when Ben Snyder asked if he had recorded his second deed, he says he told Snyder, "No, I'm not going to record it, it's a fraud", and that he told Snyder he didn't intend to place this deed on record and that he didn't intend to pay this second note.

He admits he saw the provision in the second deed correcting the error in the first one and says Ben explained it to him when he delivered the second deed to him. He was asked if he was led to believe there was a mistake in drawing the first deed and that it only called to a locust instead of a walnut and he answered that he "never did believe it". When asked if he took

the second deed home and kept it, he said, "I told my wife, we'll keep that deed here and if we ever need it for reference, we will have it."

From this it is evident that Rhinehart's contention that he was deceived into executing the second note is an after-thought. He knew perfectly well when he executed this second note and accepted this second deed everything he knows now. He knew where the boundary of his first deed was and freely entered into negotiations for his second purchase. He never undertook to cultivate any of the land south and southwest of his house which he is now claiming and which, as we have found, was not contained in his first purchase and admits he stood by and saw "The Snyders" cultivate this land in oats, corn, etc. He admits that he obtained permission from "The Snyders" to cultivate land south and southwest of his house, none of which he claimed until shortly before he was sued. Rhinehart fixes the time that he told Snyder of his claim to this land south and southwest of his house at "September or October, 1936, maybe October". The result was the filing of this suit on Oct. 26th, 1936.

Of course, he and B. B. Snyder do not agree about what Snyder told him, but this solemn fact remains, that they did agree the first boundary should be corrected and they did correct it, and every act of Rhinehart thereafter was in perfect harmony with that correction. Before a party can be defrauded the perpetrator of the fraud must make false statements or representations which the other party believes and acts upon and Rhinehart says now he never did believe what Ben Snyder told him about where the southwest line of the first tract should be. Yet, he entered into this second contract, which he now asks us to cancel because of fraud. Contracts are sometimes canceled for fraud, but here. is what we have said of such cancellations in the case of Lossie v. Central Trust Co., 219 Ky. 1, 292 S. W. 338, 340:

> "The cancellation of an executed contract is the exertion of the most extraordinary power of a court of equity, which ought not to be exercised, except in a clear case and on strong and convincing evidence."

That case has been cited by this court on that point in 10 subsequent opinions. It is the settled rule in this

jurisdiction. The court erred when it undertook to cancel "Note B" and "Deed B".

The very essence of fraud is belief in and action upon the truth of the statements of the party alleged to have perpetrated the fraud. Where the party claiming to be defrauded did not believe what was told him by the other party or did not act upon it, he can not recover. See Lewis v. Dalton, 189 Ky. 387, 225 S. W. 157; Newton v. Terry, 22 S. W. 159, 13 Ky. Law Rep. 698; Merchants' & Farmers' Bank v. Cleland, Ky., 67 S. W. 386; Ferrill v. Coombs, 18 S. W. 226, 13 Ky. Law Rep. 737; 26 C. J. p. 1134, section 55.

Rhinehart says he did not believe what Ben Snyder told him, hence it makes no difference what Snyder told him, he did not deceive him. Rhinehart gave "Note B" and received "Deed B" with his eyes wide open when he went into this second contract, and if he did so for some other reason, no matter what that other reason was, he cannot recover.

The court erred in fixing the amount of recovery. The trial court should have given judgment in favor of "The Snyders" for $56.90 and cost on "Note A" and $54.50 and cost on "Note B", both these sums to bear interest from January 28th, 1937.

The trial court should have adjudged this $54.50 to be a lien on "Tract A" as we have described it, and should have ordered it sold to pay that. The trial court should have adjudged to "The Snyders" a lien on "Tract B" for the $54.50 and ordered it sold to satisfy that. "The Snyders" had procured a restraining order, to keep Rhinehart off their land, which the trial court erroneously dissolved. The trial court should have entered an injunction directing Rhinehart to, in no way molest "The Snyders" in the possession or enjoyment of any of their land outside of "Tract B" and "Tract A" as we have described it.

The judgment entered by the trial court is reversed and shall be set aside and judgment entered as indicated.