# Sloan v. Sloan et al.

## Sloan's Ex'r et al. v. Same.

October 8, 1946.

Rehearing denied November 22, 1946.

Frank V. Benton, Frank V. Benton, Jr., Harry J. Luedeke, and John W. Heuver for appellants.

Barbour & Bassman and Arthur C. Hall for appellees.

OPINION OF THE COURT BY JUDGE SILER—Reversing.

Esther Whetton, appellant, beneficiary of a $10,000 life insurance policy of Dr. V. J. Sloan, now deceased, was sued by Vernon J. Sloan, Dr. Sloan's son, appellee, in an action seeking cancellation of that part of the insurance policy changing the beneficiary from the insured's son, Vernon, to the insured's unmarried consort, the appellant, the grounds of the requested cancellation being those of mental incapacity and undue influence. From a verdict of the jury and judgment of the trial court in favor of the appellee son, the appellant consort has taken this appeal.

The sum and substance of appellant's ground of appeal is that she was entitled to a peremptory instruction on the trial.

By a companion suit, Dr. Sloan's son contested the will of Dr. Sloan, which will likewise made a substantial provision for the said Esther Whetton, the ground of

contest being the testator's mental incapacity. From a verdict of the jury and judgment of the trial court in favor of the son, that is against the will's validity, the will's executor, who represents the consort and all others benefitting from the will, has taken this appeal in this companion case.

The sum and substance of appellant's ground of appeal in the companion will case is that the appellant, the will's executor, was entitled to a peremptory instruction on the trial of this will case.

For the purpose of this appeal, the two cases have been consolidated, but they will be conveniently referred to herein as the will case and the insurance case.

The consolidated record contains 22 volumes of pleadings and proof, much of it irrelevant, and this court has been given 5 voluminous, exhaustive but helpful briefs bearing on the legal questions presented for determination in this litigation now before us.

As indicated above, this is a contest between a decedent's consort and his son over the decedent's insurance and estate. The chief and ultimate issue turned out to be the mental capacity of the decedent. The consort asserted decedent's mental capacity. The son denied it. The son won both cases. The judge and jury decided that the decedent was mentally incapacitated to execute either the beneficiary changeover of the policy or to execute his will upon the dates in question.

Dr. V. J. Sloan died in a Cincinnati hospital on September 24, 1942, from endocarditis. His life insurance consisted of a $5,000 policy in favor of his mother, a $15,000 policy payable to the beneficial interest of his appellee son and a $10,000 policy, now in controversy, the latter having been made payable to his appellant consort by a change-of-beneficiary clause executed by the decedent in the last month of his life. His will gave two pieces of his real estate to the son and the remaining piece of his real estate to the consort. The will also divided the residue of the whole estate equally between the son and the consort.

In order to properly appraise this case it appears to be desirable to pick up some of the threads of this closed and broken life in order to ascertain what manner of

man existed in the person of Dr. V. J. Sloan, a Newport physician, who performed the principal role of the drama portrayed by the record of this case. He evidently burned the candle of life at both ends and then nonchalantly blew the last wisp of lingering smoke into a bold defiance of serious and sober convention. He married and subsequently separated from three women and finally began a consortium with appellant Whetton in a Cincinnati hotel under an assumed name. This consortium was later continued in Kentucky with ostensible representation to the public that Dr. Sloan and Miss Whetton were man and wife. The record shows that Dr. Sloan contracted a venereal disease, drank copious quantities of whiskey, spent his money freely, loved wine, women and song and at last became a physical wreck through a disability known as cirrhosis of the liver and its attending complications. Death overtook and overcame the doctor at the age of 44 years. In the course of his career, he became the father of two children, the appellee Vernon J. Sloan having been born of the doctor's first wife and a daughter named Patty, now deceased, having been born of the doctor's second wife. But on the other side of the picture, the doctor was a skillful physician, a generous man, a recipient of the firm confidence of many patients and he was a father of undoubted devotion to his two children and their welfare.

While there are many details in this record relating to events and incidents taking place in the doctor's life between 1938 and 1942, yet we are not particularly interested in the bulk of them. But we are particularly interested in the life and conduct of the doctor from June 1, 1942, to September 24, 1942, this being the period that completely encompasses the will's conception and execution and also encompasses the execution of the clause changing the insurance policy's beneficiary from son to consort.

### The Will Case.

On or about June 1, 1942, the doctor conferred with J. W. Heuver, a Newport attorney of skill, long experience and good standing, relative to preparation of a will. In that conference the doctor, who was then a busy man with his medical practice, told the attorney in detail what he wanted expressed in the will. The attorney ad-

vised and counseled, upon that occasion, with the doctor as to the best methods to be used in carrying out the desired ends of the will. The will was prepared almost immediately. It was prepared in good legal form, signed by the testator on both of its typewritten pages, duly dated and witnessed. Neither the structure nor the intellection of the will has been attacked. After that first conference between the doctor and the attorney and after the preparation of the will around June 1, 1942, the doctor himself delayed the secondary conference for concluding this business until July 31, 1942. On the latter date, around 5 in the afternoon, the attorney went to the doctor's office at the latter's request and the previously prepared will was then and there deliberately read by the doctor, who thereupon signed it and acknowledged it in the presence of the attorney and Catherine Hoban as the witnesses. The testator and the two witnesses were the only persons present on the occasion of the execution of the will. The attesting witness, Catherine Hoban, an elderly lady, had been employed by the doctor for about 20 years. Neither of the attesting witnesses had any interest in the will and both appear to be worthy of our full faith and credit. Both attesting witnesses went into the details of this occasion at length. Not one thing was said or done by the doctor on this occasion, or during the entire day of July 31, 1942, so far as this record shows that may be calculated to throw a shadow of uncertainty upon the working intelligence of the doctor for the transaction of the business at hand, the making of his will. In support of the testamentary capacity of the doctor on July 31, 1942, we find that the records of a local pharmacy show that he gave 19 medical prescriptions on that day, none of which was subject to any criticism for any kind of inaccuracy. Of course, the appellees used some expert witnesses and propounded some hypothetical questions in waging war on the will. Appellees also proved some acts of eccentricity and some possible, vague abnormalities on the part of the doctor upon different occasions during 1942 and in other years. The doctor giggled some, drank some, made some fast and furious automobile trips and indicated by his general conduct that he was not as emotionally stable as a magistrate or the corner groceryman or the pastor of a neighborhood church. Nevertheless, the doctor had a skillful lawyer prepare his will in good form. The

testator sat down and read the will carefully at the end of a busy day of his routine medical practice and he signed the will and had it properly witnessed in the presence of disinterested parties upon the very day in which he had given 19 unblemished medical prescriptions and had taken care of his usual professional duties in a normal manner.

As we see the case that was made out for the appellees against the validity of the will and against the mental capacity of Dr. Sloan, it consisted of (1) expert testimony responding to hypothetical questions and (2) some rather vague incidents of eccentric behavior on the part of Dr. Sloan, none of which occurred at the time of the will's execution or at any time during the day of July 31, 1942. This court has held that opinion evidence or conclusions of experts can not sufficiently sustain a case of a litigant, when such opinions or conclusions of experts are not supported by the proven facts as they existed. Under such circumstances, a directed verdict is proper if the expert evidence forms the foundation of such a case. Mutual Life Ins. Co. v. Danse, 256 Ky. 448, 76 S. W. 2d 233; Prudential Life Ins. Co. of America v. Howard's Assignee, 258 Ky. 366, 80 S. W. 2d 21.

A mere scintilla of evidence was not sufficient to take appellees' case to the jury on this trial, but rather it was necessary for appellees to produce upon the trial evidence of weight, character and substance sufficient to furnish a firm foundation upon which to rest the superstructure of the jury's verdict. See the case of Nugent v. Nugent's Ex'r., 281 Ky. 263, 135 S. W. 2d 877.

This court has declared in many cases that all *rational* people have the right to dispose of their worldly goods according to their own personal desires. This right has been extended to the aged, the infirm, the forgetful and the queer. See the case of Kentucky Trust Co. v. Gore, 302 Ky. 1, 192 S. W. 2d 749. Mere weakness of mental power does not render one incapable of executing a valid will. McCrocklin's Adm'r v. Lee, 247 Ky. 31, 56 S. W. 2d 564; Nugent case, supra. Mere failure of memory, momentary forgetfulness or lack of strict coherence in conversation does not render one incapable of executing his will. Compton v. Smith, 286 Ky. 179, 150 S. W. 2d 657. Even proof of insanity without

evidence of its continuity down to the date of the will does not destroy the validity of the will. Pfuelb v. Pfuelb, 275 Ky. 588, 122 S. W. 2d 128.

This litigation must not be reduced to a trial of the morals of either Dr. Sloan or Miss Whetton. Other tribunals are constituted for that purpose. We are only concerned with the testamentary capacity of Dr. Sloan on July 31, 1942. It was sound and appellees did not prove it otherwise by anything more than a mere scintilla of evidence, if they produced even that much. Therefore, the trial court should have, we firmly believe, peremptorily instructed the jury to find and return a verdict for the appellants on the trial of the will case.

### The Insurance Case

On September 1, 1942, the doctor informed Stanley W. Tillman, Division Manager of Union Central Life Insurance Company, that he wanted Tillman to stop at his house. Tillman went to the doctor's home in the evening of that same day, found him to be physically sick, asked the doctor what he wanted and learned from the doctor that he desired to change the named beneficiary in his $10,000 Union Central policy. Tillman immediately procured the policy from the doctor, obtained from him the change datum, that is the exact name of the new beneficiary, returned to his own home to prepare and complete the requested change. Tillman then called one of his company's legal advisers and received from him the proper wording necessary for an informal beneficiary change of the kind desired by Dr. Sloan. Tillman had the informal transfer typed in duplicate and then returned with it to Dr. Sloan's home later in that same evening of September 1, 1942. There at the Sloan residence in the late evening of September 1, 1942, the change of beneficiary clause was executed. Besides Tillman and Dr. Sloan there were present Stanley Glazier, who was a close friend and investment counselor to Dr. Sloan, appellant Whetton and Emma Sloan, the doctor's mother. The change clause was signed by Dr. Sloan in the presence of the four people mentioned, but only Tillman and Glazier signed the clause as witnesses to Sloan's signature. There has been no attack on the form or wording of the change clause. Neither the signature of Dr. Sloan nor the reality of the execution of the change clause by him has been attacked. Later, there was a

longer, more formal change clause executed which carried out the same purpose as that intended by the informal clause of September 1, 1942. The formal clause was executed by Dr. Sloan at a Cincinnati hospital on September 17, 1942, one week before he died and 15 days after he had entered the hospital in his fatal illness. The evidence shows that the formal clause was merely complementary to the informal clause; that the informal clause was considered legally sufficient in form to accomplish its intended purpose; that the formal clause was executed only to meet the preference of the insurer and to enable the beneficiary to keep the insurance benefit invested with the insurance company on interest. Under these conditions, we deem that the issue of the mental capacity of Dr. Sloan and the issue of undue influence exerted upon him must center upon the transactions of the date of September 1, 1942, or dates closely preceding thereto. The two witnesses to the informal change clause stated the doctor had his full mental faculties on that date. Appellant Whetton testified likewise. Emma Sloan, who was the doctor's mother and who is the appellee son's grandmother, testified that she saw the doctor sign the change clause; that the doctor never spoke; that he was very sick, yet could not recline in bed on account of his heart and physical condition; that appellant Whetton gave the doctor a book to rest the change clause upon while he signed it and also gave him the pencil for writing his name. That summarizes, in a very brief way, the evidence of the four persons present at the execution of the informal change clause. They appear to have been the only persons on the scene of events on that occasion. The appellees also introduced a Newport pharmacist named Brown who had known the doctor and transacted business with him for a number of years. Brown had employed the doctor's son, appellee in this case, to work during summer vacations in the drug store operated by Brown. Brown testified that the doctor had told him that he drank as high as 3 quarts of whiskey daily; that he believed this chronic drinking continued until the doctor's death; that the doctor bought 100 phenobarbital tablets every 2 or 3 weeks which the doctor said he was taking to induce sleep; that he saw the doctor either on August 31, 1942, or on September 1, 1942, at night in the doctor's home; that the doctor had been drinking and ''acted very flighty like he had been drink-

ing;" that the doctor was up and about the house on that occasion but conversed with him in an irrational manner. In addition to the foregoing evidence bearing upon the happenings and conditions of September 1, 1942, there was undisputed evidence that the doctor went with appellant Whetton to a Newport bank on that same date and changed his personal and individual bank account to a dual and joint account with appellant Whetton. The banker who handled that transaction testified that the doctor was in full possession of his mental faculties on that occasion.

There was no evidence showing any fact or circumstance of mental deficiency on the part of the doctor at the exact time of the occasion of the execution of the informal change clause. He first expressed his intention of changing part of his insurance at least 30 days before September 1, 1942, in the presence of disinterested witnesses and entirely outside of the presence of appellant Whetton. This intention was carried out deliberately and in accordance with his original idea. The doctor had the thought of changing his insurance on his mind three distinct times on September 1, 1942—once when he called Tillman in the afternoon, once when Tillman came to the doctor's home in response to the doctor's previous call and finally when Tillman returned on the second trip to the doctor's home. There was no wavering from that thought that consistently ran through the doctor's mind three times on that same day and there was no hesitation or irresolution in carrying out his intention. No witness ever said the doctor was under the effect of whiskey or any kind of a drug at the time he executed the change clause.

We have not been able to find any evidence of any word or act on the part of appellant Whetton indicating that she urged, coerced or pushed the doctor into his apparently deliberate act of changing his insurance. The change clause was not executed in great haste nor was it done in cloistered secrecy. The doctor, appellant Whetton, the doctor's mother and two entirely disinterested persons were present. No one raised any suggestion either concerning the doctor's mental competency or his possible susceptibility to undue influence.

This court has firmly committed itself to the principle that the cancellation of an executed contract by a

court of equity is the exercise of an extraordinary power and should not be resorted to except in a clear case and on strong and convincing evidence. Lacy v. Layne, 190 Ky. 667, 228 S. W. 1; Reid v. Wilder, 204 Ky. 395, 264 S. W. 849; Fields v. Cornett, 254 Ky. 35, 70 S. W. 2d 954; Schimmelpfennig v Jungkind, 273 Ky. 182, 115 S. W. 2d 895; Mortgage Union of Pa. v. Wilson, 273 Ky. 544, 117 S. W. 2d 177; Snyder v. Rhinehart, 274 Ky. 274, 118 S. W. 2d 543. The power of a court of equity to set aside a deed is extraordinary and should not be lightly exercised. Petrey's Adm'r v. Petrey, 262 Ky. 222, 90 S. W. 2d 4; Johnson v. Johnson, 292 Ky. 175, 166 S. W. 2d 285. A court will not cancel a contract, we have heretofore said, without the showing of a substantial reason. Norton v. Norton, 219 Ky. 612, 294 S. W. 191.

On the question of undue influence, we have defined it as any influence obtained over the mind of a grantor or testator to such an extent as to destroy his free agency, and to constrain him to do against his will what he would otherwise refuse to do. But any reasonable influence obtained by acts of kindness or by argument addressed to the understanding is not in law undue influence. Chrisman v. Quick, 174 Ky. 845, 193 S. W. 13. There are few of us indeed who do not at some time follow the suggestions made by members of our families, and undue influence can not be predicated on this fact where the suggestion is not unreasonable. Schrodt's Ex'r v. Schrodt, 181 Ky. 174, 203 S. W. 1051. The undue influence for which an instrument will be annulled must be such that the party making it has no free will, but stands in vinculis. It must amount to force or coercion, destroying free agency. 9 American Jurisprudence, 365.

When we measure all of the best evidence, which was produced by appellees and which was relevant to the exact questions in issue, upon the yardstick of the legal principles set out above, we are constrained to conclude that such evidence was entirely insufficient to sustain the jury's verdict or the trial court's judgment in this insurance case. There was no clear and convincing evidence that Dr. Sloan was unbalanced when he signed the change-of-beneficiary insurance clause on September 1, 1942, but there was strong evidence that he knew exactly what he was doing, both in respect to

his insurance policy and also in relation to his bank account transaction of that same day. Neither was there any evidence to indicate that any person destroyed the free agency of Dr. Sloan or put him *in vinculis* upon the occasion of the insurance change or previously thereto. We were unable to find any proof of any suggestion made by any person to Dr. Sloan concerning his insurance policy.

Dr. Sloan must be considered, we think, in the light of just what he appears to have been, namely a person of self-will but not a person of self-control or self-contentment. He was always intelligent, yet he was frequently foolish in the general conduct of his life. It is impossible to commend his conduct, but it is imperative to endorse his mentality, his medical skill and his business acumen. He was the adequate author of his personal affairs, including the execution of his will and the designation of his insurance beneficiaries, and the courts are not allowed to erase one single letter of the structural design of these documents that came out of the plans and blue prints of the doctor's own rationalism.

Wherefore, the judgment of the trial court is hereby reversed in each of these cases for proceedings consistent herewith.