COLUMBIA GAS OF KENTUCKY, INC.,
Appellant,

v.

Gene D. TINDALL et al., Appellees
(two cases).

Court of Appeals of Kentucky.

May 9, 1969.

William P. Curlin, Jr., R. Vincent Good-
lett, Hazelrigg & Cox, Frankfort, William
Roy Rice, Charleston, W. Va., for appel-
lant.

Raymond O. Harmon, William P. Swain,
Boehl, Stopher, Graves & Deindoerfer,

Louisville, William E. Johnson, S. Roy Woodall, Jr., William M. Johnson, James P. Hanrahan, Herbert D. Liebman, Howard Black, Frankfort, for appellees.

DAVIS, Commissioner.

An explosion, or explosions, followed by fire substantially damaged a newly built residence and caused personal injuries to some occupants of the house. A verdict of $23,261.57 went against Columbia Gas of Kentucky, Inc., based on Columbia's claimed negligence in failing to properly inspect the gas lines serving the premises.

Columbia appeals, presenting three "basic propositions": First, the evidence was not sufficient to support the finding that Columbia was negligent, and indeed was insufficient to show that the explosion was caused by natural gas; second, the trial court committed reversible error in summarily dismissing an original defendant without notice to Columbia; and finally, an indispensable party was not joined.

After the present appeal had been filed, Columbia made a motion for relief pursuant to CR 60.02, which was denied. An appeal from such denial has been consolidated with the original appeal, and both appeals will be disposed of in this opinion.

Robert Crawley, *Junior*, contracted to sell a house he was building in a Frankfort subdivision to Gene Tindall. The lot on which the house was built was owned by Robert Crawley, *Senior*. The failure to make Crawley, *Senior*, a party is the basis of the claimed error of failure to join an indispensable party and will be dealt with later in the opinion.

On or about Wednesday or Thursday, October 2 or 3, 1963, Tindall sought and obtained *Junior's* consent to move into the nearly completed house, provided *Junior* could arrange for the gas to be connected and finish a few minor items. An employee of Columbia went to the site on the morning of Friday, October 4, at which time he tested the gas lines inside the house under pressure of three pounds per square inch for ten minutes and found no leak. He also tested the outside service line at 50 pounds per square inch for five minutes and found no leak. The same employee observed that the meter manifold risers were not level, noting an imbalance of three or four inches. He placed a note to that effect on the risers and informed the gas company's office.

The irregularity of the risers was made known to Gus Pat Coleman, the plumber who had charge of installing the gas lines. One of Coleman's employees testified that he adjusted the risers to level by digging from a "swing-joint" out to the first "L" and raising the pipe by hand and filling under the raised pipe with dirt. When this was accomplished, the small excavation was backfilled. Columbia emphasizes that this workman said he did not bend the pipe in raising it, noting that the "swing-joint" affords flexibility for this procedure. Coleman's employee then tested the outside service line at 50 pounds per square inch for ten minutes and found no leak.

On Saturday morning, October 5, Columbia's employee, Virgil Peyton, installed the gas meter after a visual inspection revealed that the risers were level. Peyton noticed that there had been a "little" excavation around the "service side," and the ground was loose. Peyton said he tested the outside line at 50 pounds and the inside line at three pounds with negative result. An explosion test conducted by Peyton was also negative, he said. After Peyton had completed these tasks, turned on the gas, and removed his equipment to his truck, Mrs. Tindall first appeared, and he lighted the appliances at her request. It should be noted that Mrs. Tindall contradicted Peyton's testimony by saying that she admitted Peyton to the house and that the time Peyton spent in the house was too brief for him to have conducted the tests of which he spoke.

Without further detailing the evidence in behalf of Columbia, it is proper to

summarize by noting that Columbia showed that four tests were made on the outside line by three different men, and three separate tests were made of the interior lines by three persons, all of which reflected the lines tight and without a leak. Even after the damage, certain tests did not disclose interior leaks. In these circumstances, Columbia contends, there could be no factual basis for a jury's finding of Columbia's negligence. If there were no other evidence, Columbia's position would seem insurmountable.

However, there is another side of the coin. It was shown that the windows in the basement were open until about 5 p. m., Sunday, October 6. When the Tindalls came home from a Sunday visit that afternoon, Mrs. Tindall noted an unusual odor. Mr. Tindall did not detect it but felt that a cold would have prevented his sensing the odor anyway.

The Tindall children were bathed and put to bed shortly after supper. Mr. and Mrs. Tindall retired about 10 p. m. just after Mr. Tindall had turned the furnace thermostat as low as it would go. He had examined the pilot lights of the furnace and hot-water heater just before retiring, since Mrs. Tindall was still remarking about a "funny smell" in the house. A minute or two after he turned back the thermostat, the Tindalls heard "a couple of clicking sounds and the house blew up." The Tindalls were tossed upward; the floor of the one-story house was blown up about ten inches, and when it fell back was "a little askew" of the foundation. A following fire substantially destroyed the building and caused some personal injuries to members of the Tindall family.

Some neighbors heard an explosion at the Tindall house. When they looked toward the house they saw "little blue flames" playing along the ground near the meter. Those "little blue flames" rapidly "crawled" toward the foundation of the house and suddenly ran up the walls toward the roof, at which there was an eruption (possibly a smaller explosion) from each of the gable ends of the attic. Following this, the house burned rapidly.

The plaintiff-appellees presented Stratton Hammon as an expert witness in their behalf. In dealing with Hammon's testimony Columbia pointedly states in its brief:

"If Stratton Hammon's opinion was admissible evidence, then plaintiffs may well have had enough evidence to get their case to a jury—because Stratton Hammon swore he believed natural gas from leaking pipes to have been the sole cause of the explosion."

Following this, Columbia's brief deals with six points in which it regards Hammon's opinion evidence as utterly refuted and inadmissible within the rule announced in Sloan v. Sloan, 303 Ky. 180, 185, 197 S.W.2d 77, 80, because it was not supported by the proven facts.

Hammon arrived at the scene on Tuesday, October 8. He related tests and inspections by which he located two leaks in the interior line and one in the exterior or service line. He opined that these leaks had existed before the disaster, whereas Columbia's evidence and theory tend to show these leaks resulted *from* the explosion. Columbia says that it is beyond credence that so many tests as were made before the fire would have failed to disclose the leaks. However, there are circumstances in the record tending to impugn the complete accuracy of those tests. The court and jury were not required to accept the verity of the evidence relating to the tests in. light of some circumstantial refutation of them and since they were related primarily by Columbia-oriented witnesses. Scott v. Patterson, Ky., 400 S.W. 2d 526, 531.

Much is made of Hammon's referring to more than one explosion in face of considerable testimony that only one explosion occurred. We think the preponderance of the evidence tends to show more than one explosion. The neighbors

who testified to being alerted by the first blast specifically recounted "explosion-like" action from the attic. Hammon's testimony on this point appears to be consistent with the proven facts and tends to support his theory and refute Columbia's.

■ Columbia urges that a large quantity of volatile material was found in at least two five-gallon cans in the basement. The point is advanced that vapors emanating from these sources caused the explosion and fire. There was substantial evidence to the contrary. Hammon explained in detail why he deemed the explosions as having origin in natural gas. We cannot say as a matter of law that his conclusion in this respect was unsupported by proven facts.

On the day after the holocaust, some tests conducted by representatives of the State Fire Marshal failed to disclose any leak in the interior line. On the next day Hammon's tests revealed two. Hammon explained why his test uncovered the leaks whereas the earlier tests had not. The explanation was not so patently incredible as to render it inadmissible.

Columbia had evidence supporting the view that the outside leak was caused *by* the explosion. Hammon gave a plausible explanation of his contrary view. The circumstances and testimony relating to this point were in issue, and Columbia's evidence was not so overwhelming, nor Hammon's so unbelievable, as to require rejection of Hammon's evidence as a matter of law.

■ As to the final of the six points, Columbia asserts that Hammon failed to properly "explain away" the volatile vapors from the cans as the origin of the explosion. Without elaboration we consider the record on this point as adequately creating a jury issue as to the origin of the explosion. We are not at all persuaded that Columbia's evidence established conclusively that the explosion was not caused by natural gas or that it was caused by volatile vapors

from the cans found in the basement. The resolution of that issue was properly a jury function.

■ It is significant that Columbia does not, nor could it under the evidence, challenge the qualifications of Hammon as respects training and experience. In our view Columbia has failed in its effort to demonstrate the inadmissibility of Hammon's evidence. It is to be recalled that Hammon's testimony was based in large part upon his personal examinations and tests at the site of the incident. His conclusions were not merely the expressions of an expert based on hypothesis. Thus, accepting Columbia's admission that *if* Hammon's evidence was admissible plaintiffs made out a case for the jury, we conclude that the trial court properly submitted the case to the jury, and the jury's verdict was supported by substantial evidence of probative value.

■ Originally, Robert Crawley, *Junior*, was a named defendant. He moved for summary judgment against the plaintiffs, but Columbia had no notice of that motion, nor did it have opportunity to attend the hearing on the motion. The trial judge granted *Junior's* motion on the theory that an independent contractor had installed the gas lines so that *Junior* had no liability for the acts of that independent contractor. Then *Junior* was permitted to join as a plaintiff seeking recoupment for damages to his building. The court refused to permit Columbia to counterclaim against *Junior* on the same theory of independent contractor. CR 5.01 required notice to Columbia of the summary-judgment motion, but failure to give the notice had no prejudicial effect on Columbia. There was no issue between Columbia and *Junior*.

■ The trial court was consistent in denying Columbia a counterclaim against *Junior*, since any responsibility of *Junior* would have been derivative, and the court had already ruled that *respondeat superior* was inapplicable. There was nothing in

this ruling of the trial court which prejudiced Columbia, particularly in light of the jury's finding.

■ When Columbia learned that Robert Crawley, *Senior,* owned the lot on which the house had been built, it moved to dismiss the action for failure to join him as an indispensable party, relying on CR 19.01. The trial court overruled the motion, conditioned upon obtention of a release from *Senior.* A release from him was filed, but it, too, was conditioned by a clause which preserved *Senior's* "rights pending any appeal that may be taken." It is explained by appellees that this condition merely preserved *Senior's* right to file suit to toll the statute of limitation which otherwise would have foreclosed him if the appellate court ruled that he was an indispensable party. In fact, *Senior* did file such a suit in the Franklin Circuit Court during the pendency of this appeal and when the limitation bar was imminent. That prompted Columbia's motion under CR 60.02, the overruling of which is now before us. It is our view that Robert Crawley, *Senior,* will be fully and firmly bound by the release he executed and filed. Since we are affirming the judgment originally appealed, the reservation of rights in the release becomes a moot and meaningless provision. No justifiable purpose could be attained by ordering a new trial because Crawley, *Senior,* was not a party since his rights are completely foreclosed.

Columbia, by a residuum-type presentation, lumps four other assignments of error.

■ It is contended that appellees failed to prove that conditions were the same when Hammon made his tests as they were just after the fire. Additionally, Columbia observes that Hammon admitted he altered the conditions by moving the interior pipes. There was abundant circumstantial evidence warranting the inference that no substantial or material change in conditions occurred between Sunday night and the occasion of Hammon's tests. He fully explained the circumstances of his raising the interior pipe. We find no such discrepancy in physical conditions as existed in Chesapeake & Ohio Ry. v. Pittman, 292 Ky. 331, 166 S.W.2d 443, and Rollins v. Avey, Ky., 296 S.W.2d 214, relied on by Columbia.

■ Columbia sought to have its witness Murphy express an opinion that the explosion resulted from vapors arising from volatile material in the basement. The court excluded the evidence, which was received by avowal, on the basis that Murphy had not related qualifications to warrant his expressing an expert opinion on that phase of the case. We agree with that conclusion. Murphy evinced expertise in natural-gas matters but did not purport to be trained or experienced in the field of explosions generally. He did not know the substance in the cans, and his own testimony discloses that he was not qualified to express opinion in the area complained of.

■ Columbia sought to "impeach" Hammon by confronting him with a Per Curiam opinion of this court which is reported as Hammon v. Bayless, Ky., 310 S.W.2d 267. We think it is obvious that the trial judge correctly excluded such an effort at impeachment. We perceive no basis in CR 43.07 or CR 43.08, or elsewhere, by which this method of "impeachment" could be justified.

■ Columbia offered to show a moving-picture film made by members of the Frankfort Fire Department on Monday morning after the fire. The court declined to permit a showing of the film. Columbia recognizes that the trial court is vested with discretion in the matter of permitting exhibition of motion pictures, citing 29 Am. Jur.2d, Evidence, Section 801, page 883. We are told that the film depicted a fourth can in the debris. It would have been relatively simple to offer enlargements of the pertinent frames of the film, but this was not done. Certainly the evidence would have been merely cumulative. In the

absence of some formal avowal, we cannot assign this ruling of the trial court as reversible error.

The judgments are affirmed in each of the appeals identified in this court by file numbers V–86–67 and F–156–68.

All concur.