Geneva NELSON, Plaintiff,

v.

**METROPOLITAN TOWER LIFE INSURANCE COMPANY,**
Defendant.

No. CIV. A. 97–45.

United States District Court,
E.D. Kentucky.

March 23, 1998.

Lawrence R. Webster, Pikeville, KY, Eldred E. Adams, Jr, Adams & Adams, Louisa, KY, for Geneva Nelson.

Henry E. Kinser, Samuel G. Bridge, Jr., Wyatt, Tarrant & Combs, Lexington, KY, Samuel G. Bridge, Jr., Wyatt, Tarrant & Combs, Louisville, KY, for Metropolitan Tower Life Ins. Co.

## MEMORANDUM OPINION AND ORDER

HOOD, District Judge.

The defendant, Metropolitan Tower Life Insurance Company ("MetLife"), has moved the Court [Record No. 28] for summary judgment, to which the plaintiff, Geneva Nelson ("Ms. Nelson"), has responded [Record No. 40]. Additionally, Ms. Nelson has moved the Court [Record No. 27] for partial summary judgment, to which MetLife has responded [Record No. 41]. These matters are now ripe for decision.

The following are the pertinent facts. The insured, Ed Nelson, and Ms. Nelson were married in 1986. On December 1, 1988, MetLife issued the insured a $100,000 life insurance policy, and Ms. Nelson was named the beneficiary. In August of 1994, the insured was diagnosed with terminal cancer.

Beginning in or about February of 1995, the insured spent part of his time with his wife in Ohio and part of his time with his mother in Floyd County, Kentucky. However, by November of 1995, the insured had become estranged from his wife, and from then until his death, he remained exclusively in his mother's home in Kentucky.

In the spring of 1995, the insured became eligible and applied for a disability waiver under the policy. MetLife required and obtained certification by then treating physician Dr. Davis. Although the insured was found to be disabled, Dr. Davis found that he was competent to endorse checks and direct the use of the proceeds.

On November 22, 1995, the insured signed an enrollment form in which he asked that an acceleration of death benefits clause be added to his policy. The rider provided the insured with the option of receiving the death benefits under the policy before his death upon satisfactory proof of terminal illness. On December 6, 1995, approximately two months before his death, the insured exercised his right to accelerate and receive such benefits.

However, before any proceeds were issued to the insured, Dr. Leslie, the insured's then treating physician, certified that the insured's illness was expected to be terminal within six months and that he was mentally competent to direct the use of the proceeds and manage his own affairs. Dr. Leslie's opinions were based on a mental examination.

On December 11, 1995, the insured changed the beneficiary of his policy, substituting his mother in place of his wife. On December 12, 1995, the insured was issued a check by MetLife for $93,471.85, representing the accelerated death benefits payable under the policy, and cashed it.

The first issue to be addressed is whether the insured was acting of his own free will when he exercised his policy right to accelerate the death benefits. Ms. Nelson claims that her husband was the subject of undue influence and/or was mentally incompetent at the time he accelerated the benefits.

The insured's acceleration of the benefits had the effect of changing the beneficiary from his wife to himself. Kentucky law is clear that an "insured has exclusive authority to designate whomever he chooses as beneficiary and to change his designation without limitation during his lifetime." *Hughes v. Scholl,* 900 S.W.2d 606, 607 (Ky.1995). A named beneficiary has no vested interest

during the life of the insured; any interest is nothing more than a mere contingency or expectancy. *McKenty v. Caldwell,* 287 Ky. 750, 155 S.W.2d 193, 194 (1941).

■ Additionally, the ability to change the beneficiary is part of the insured's contractual rights. *Farley v. First National Bank,* 250 Ky. 150, 61 S.W.2d 1059, 1061 (1933). In *Farley,* Kentucky's highest court stated that:

[i]t is an essential part of the contract that he retains control of the policy, at least, to the extent of changing the beneficiary. Whether the change shall be made is wholly under his control and the manner of making it entirely a matter between him and the insurer.

*Id.*

The above principles were recognized in *National Life & Accident Insurance Co. v. Walker,* 246 S.W.2d 139 (Ky.1952), a case factually similar to the one at bar. In *Walker,* the insured originally named his wife as the beneficiary in several insurance policies. The insured's wife remained as the beneficiary for several years, but one month prior to his death the insured substituted his mother as the named beneficiary. *Id.* at 140. After the proceeds were paid to the insured's mother, the spouse brought an action alleging various improprieties on the part of the insurance company. In holding for the insurance company, the court stated that a beneficiary does not obtain a vested interest prior to the death of the insured. *Id.* at 140–41.

Along with *Walker,* the case of *Sloan v. Sloan,* 303 Ky. 180, 197 S.W.2d 77 (1946), is extremely relevant to the case at hand.[1] In *Sloan,* the court addressed claims of mental incapacity and undue influence after the insured changed the beneficiary under both his will and insurance policy. The *Sloan* court held that:

[t]his Court has firmly committed itself to the principles that the cancellation of an executed contract by a court of equity is the exercise of an extraordinary power and should not be resorted to except in a clear

case and on strong and convincing evidence. (citations omitted).

*Id.* at 82. The court went on to state that it was required to look at the insured's mental condition at the moment the documents were executed. *Id.* at 79. Therefore, even though there was evidence that the insured behaved peculiarly, the court focused on the insured's mental state at the time he signed the documents. *Id.* at 79–80. The court held that:

[t]his Court has declared in many cases that all rational people have the right to dispose of their worldly goods according to their own personal desires. This right has been extended to the aged, infirm, the forgetful and the queer. Mere weakness of mental power does not render one incapable of executing a valid will. Mere failure of memory, momentary forgetfulness or lack of strict coherence in conversation does not render one incapable of executing his will. Even proof of insanity without evidence of its continuity down to the date of the will does not destroy the validity of the will. (citations omitted).

*Id.* at 81.

In *Sloan,* the insured was very ill on the date he signed the change of beneficiary form. *Id.* The insured never spoke a word and could not recline in bed on account of his heart and physical condition. Additionally, the new beneficiary was present when the insured changed the form. *Id.* In fact, the new beneficiary gave the insured a pencil to write with and a book to rest the change of beneficiary clause on while he signed it. *Id.* at 82.

Additionally, evidence was presented that the insured drank as much as three quarts of whiskey a day and bought 100 Phenobarbital tablets every two to three weeks. *Id.* at 82. There was also testimony that the insured had been drinking and making irrational statements on the day he changed the beneficiary of his policies. *Id.*

However, even with all the above evidence, the court found that the insured expressed his desire to change the beneficiary on the

1. The Court finds it very significant that the plaintiff did not attempt to address or distinguish *Sloan.*

day in question. *Id.* at 82–83. The court held that the insured expressed his intention to change the beneficiary in three ways: (1) he called his agent and asked for the forms necessary to change the beneficiary under the policy; (2) the agent came to the insured's home and retrieved the policy; and (3) the agent returned again that evening, and the beneficiary change was executed. *Id.* "There was no wavering from that thought that consistently ran through the doctor's mind three times on that same day, and there was no hesitation or irresolution in carrying out his intention." *Id.* at 82. The court also placed significant weight on the fact that the witnesses who were present testified as to the insured's competency. *Id.*

■ In the case at bar, the undisputed medical testimony is that the insured was mentally competent to apply for and receive accelerated death benefits under the policy and to enforce his right to change the beneficiary.[2] In fact, Dr. Leslie performed a mental examination for the specific purpose of determining the insured's mental competency and found the insured to be competent minutes before the accelerated benefits claim form was signed and a few days before the beneficiary change was made.[3]

Furthermore, the desire to cash in his policy was one which the insured, like the insured in *Sloan*, expressed on more than one occasion. The following demonstrate the insured's intent to accelerate his insurance

benefits: (1) he requested the change of beneficiary forms from MetLife; (2) he signed the appropriate forms; (3) he accepted the check from MetLife; and (4) the check was cashed. The fact that the insured decided that he wanted to obtain some benefit from the insurance proceeds and to dispose of his insurance benefits while he was still alive is not a sign that he is incompetent.

Additionally, the request for change in beneficiary and the accelerated death benefits claim forms were all witnessed by Sandra Honeycutt. Ms. Honeycutt stated unequivocally in her deposition that the insured was competent when he filled out the forms.[4] Based on the testimony of Dr. Leslie, Dr. Davis, and Ms. Honeycutt, the evidence is overwhelming that the insured was competent and acting of his own free will.[5]

Moreover, the insured was dying and living with his mother in Kentucky when he changed the beneficiary of his policy.[6] It should not have surprised Ms. Nelson that her estranged husband might want his mother, as opposed to her, to benefit from his insurance policy. Although this shows that the insured might have loved his mother more than his wife during the latter part of his life, it does not show that he was incompetent or the subject of undue influence. To the contrary, the insured's decision to substitute his mother for his wife was a logical decision based on the circumstances.[7]

2. The plaintiff's conclusory and unsubstantiated claims that the insured was subject to undue influence and/or incompetent is directly contradicted by the medical testimony.

3. It should also be emphasized that Dr. Davis stated that the insured was competent to conduct business. On the other hand, the plaintiff has failed to present any testimony from a doctor, stating that the insured was incompetent when he changed his policy.

4. The affidavits of the two hospice workers, Rita Phillips and Judy Elder, are very suspect because they were not present when the insured changed the insurance policy. Furthermore, Ms. Phillips is only a Certified Nursing Assistant, and Ms. Elder is a social worker. Hence, their opinions as to the insured's state of mind on a particular day or to his competency are unpersuasive.

5. It should be noted that the plaintiff claims that there was a lot of hostility between her and the

insured's family, and thus, she attempts to give the inference that they were improperly influencing the insured in an effort to get him to change the policy. However, the bottom line is that all the medical testimony indicates that the insured was competent to change the policy. Furthermore, the alleged inferences of undue influence in this case are no where near as outrageous as the ones in *Sloan*, and Kentucky's highest court held that the insured in that case was competent and not a subject of undue influence.

6. The insured lived the latter part of his life with his mother in Kentucky, and Ms. Nelson lived in Ohio.

7. It should be emphasized that there is no substantive evidence supporting the plaintiff's position. The plaintiff's suit against MetLife is based strictly on speculative inferences and conclusory allegations.

■ The next issue to be addressed is whether MetLife's decision to allow the insured to change his beneficiary constituted fraud upon Ms. Nelson's dower rights. On August 25, 1995, Ms. Nelson orally notified MetLife that she believed the insured's sister, a MetLife representative, would attempt to have the insured cash in the policy as the insured was a terminal cancer patient. Ms. Nelson promised to send a doctor's letter regarding the insured's competency and advise MetLife if she got guardianship papers. Although she sent a list of medications, Ms. Nelson never sent MetLife a statement regarding the insured's ability to handle his business and personal affairs. In fact, MetLife made a follow-up request, asking Ms. Nelson to send it a doctor's statement regarding the insured's competency, but she never did submit any such statement.

Conversely, before MetLife issued a check to the insured, Dr. Leslie examined the insured and found him to be competent. On December 12, 1995, MetLife issued a check to the insured in the amount of $93,471.85. On February 7, 1996, the insured died, and shortly thereafter, MetLife paid the insured's mother $7,949.25. Based on the undisputed facts, there is no substantive evidence that MetLife somehow participated in a scheme to defraud Ms. Nelson out of her dower rights.

First, MetLife attempted on two occasions to obtain from Ms. Nelson a doctor's report, stating that the insured was incompetent, but she never did send in such a document. Additionally, MetLife only allowed the insured to accelerate the death benefits and receive the proceeds after Dr. Leslie, then treating physician, certified that the insured was competent. Moreover, considering the urgent nature of the insured's request, the fact that MetLife was contractually bound to follow the insured's instructions, and the doctor's certificate of mental competence in connection with his request, it is not hard to imagine that MetLife would have been sued for breach of contract and bad faith failure to pay if it had not have honored the insured's request.

■ Furthermore, since Ms. Nelson was a revocable beneficiary, she did not have a vested interest in the insurance policy.[8] Thus, MetLife could not have defrauded her out of anything because all it did was pay the insured the money that rightfully belonged to him. If there were any fraudulent conveyances, they occurred after MetLife paid the insured the accelerated benefits and was out of the picture.[9] Although the Court understands that Ms. Nelson would have liked to have gotten the $100,000 from the insurance policy, she has no meritorious claims against MetLife. In fact, the only thing that MetLife is guilty of is honoring a dying man's request and fulfilling its contractual duties.

Finally, on this point, even if MetLife's agents conspired to defraud Ms. Nelson out of her dower rights, MetLife cannot be held vicariously liable. MetLife's agents sell policies and deal with changes in coverage, but any acts of fraud perpetrated against Ms. Nelson would have been outside the scope of their employment. In this case, MetLife had to pay the insurance proceeds to someone, and thus, MetLife did not stand to benefit financially by attempting to defraud Ms. Nelson. Therefore, even if MetLife's agents attempted to defraud her, they were clearly acting against the financial interest of MetLife and outside the scope of their employment.[10]

■ As to Ms. Nelson's allegations that MetLife did not settle the insured's claims in

8. Ms. Nelson had nothing but a mere expectancy.

9. In other words, there cannot be a fraudulent conveyance based solely on the fact that an insured cashes in his insurance policy. A fraudulent conveyance can occur if after receiving money the insured transfers it to a third party. However, MetLife cannot be responsible for the later acts of the insured. It should also be pointed out that there is absolutely no support in the record that MetLife wanted to prevent Ms. Nelson from receiving the proceeds. Instead, all MetLife wanted to do was to carry out the wishes of the insured as it was contractually bound to do. Lastly, MetLife knew that it was going to have to pay someone the proceeds, and upon receiving the insured's certificate of competency, it had no choice but to pay the insured and make any changes he wanted.

10. Any actions by agents that give the appearance of impropriety hurt the financial interest of MetLife.

good faith, they are completely frivolous. First, since Ms. Nelson did not have any interest in the policy, she does not have standing to bring claims under the Unfair Claims Settlement Practices Act and Consumer Protection Act. Second, MetLife was cautious, requiring a doctor's certificate of competency before releasing the funds, and promptly paid the insured. Hence, the plaintiff's claims under the above statutes do not make any sense. Lastly, Ms. Nelson's claims under the statutes are conclusory and unsubstantiated in the record.[11] Accordingly,

IT IS ORDERED:

(1) That MetLife's motion for summary judgment [Record No. 28] be, and the same hereby is, GRANTED;

(2) That the plaintiff's motion for partial summary judgment [Record No. 27] be, and the same hereby is, DENIED;

(3) That the plaintiff's motions [Record Nos. 36 & 38] for extensions of time be, and the same hereby are, DENIED AS MOOT.

---

11. It should be noted that in Ms. Nelson's motion for partial summary judgment she concedes that the marital domicile was in Ohio and cites Ohio's descent and distribution statute. However, under Ohio law, a spouse does not get a dower interest in personalty. *See Neville v. Sawicki,* 64 N.E.2d 685, 687–88 (Ohio Ct.App.1945). Hence, it is impossible for MetLife to defraud Ms. Nelson out of her dower interest in the insurance proceeds, if she never had a dower interest in them.