C. N. SCOTT, Administrator of Estate of George Meissner, Deceased, Appellant,

v.

Clara PATTERSON, d/b/a Central Kentucky Gas Company and T. J. Hill, III, Administrator of Estate of Cordell Powers, Deceased, Appellees.

C. N. SCOTT, Administrator with Will Annexed of Exia Campbell, Deceased, Appellant,

v.

Clara PATTERSON, d/b/a Central Kentucky Gas Company and T. J. Hill, III, Administrator of Estate of Cordell Powers, Deceased, Appellees.

Lloyd MARTIN and Bettie Martin, Appellants,

v.

Clara PATTERSON, d/b/a Central Kentucky Gas Company and T. J. Hill, III, Administrator of Estate of Cordell Powers, Deceased, Appellees.

Margaret MEISSNER, Appellant,

v.

Clara PATTERSON, d/b/a Central Kentucky Gas Company and T. J. Hill, III, Administrator of Estate of Cordell Powers, Deceased, Appellees.

Court of Appeals of Kentucky.

March 11, 1966.

Pat Rankin, Stanford, John L. Davis, Stoll, Keenon & Park, Lexington, Clarence L. Donovan, Bedford, Ind., Marvin Cornett, Stanford, for appellants.

Pierce Lively, Danville, T. J. Hill, III, Stanford, for appellees.

PALMORE, Judge.

On the morning of June 9, 1962, a gas explosion occurred in the home of Mrs. Exia Campbell at Crab Orchard, Kentucky, fatally injuring Mrs. Campbell, her son-in-law, George Meissner, and Cordell Powers, a service man employed by the appellee Clara Patterson, d/b/a Central Kentucky Gas Company. Also injured were Margaret Meissner (Mrs. Campbell's daughter) and Mr. and Mrs. Lloyd Martin, occupants of an apartment in the Campbell house. Suits brought by the Martins, Mrs. Meissner, and the personal representative of the estates of Exia Campbell and George Meissner against the gas company (Clara Patterson) and the estate of Cordell Powers were

consolidated for trial and resulted in a unanimous verdict as follows:

"We do not have the evidence necessary to convince the jury that *Ordinary Care* was not used, therefore we find for defendants."

The various plaintiffs appeal from a judgment of dismissal entered pursuant to the verdict. Their sole contention is that the trial court should have sustained their motions for a directed verdict and for a judgment n. o. v. on the issue of liability. So the question before us is whether, in the light of all the evidence on both sides, the only reasonable conclusion to be drawn was that the accident was caused by the negligence of the defendants. Cf. Lee v. Tucker, Ky., 365 S.W.2d 849 (1963); Droppelmann v. Willingham, 293 Ky. 614, 169 S.W.2d 811, 814 (1943).

The only eyewitness who survived to testify was Mrs. Meissner. She and her husband had driven to Crab Orchard from their home in Bedford, Indiana, on Friday, June 8, 1962, to visit Mrs. Campbell. Shortly after arriving in the middle of the afternoon they smelled gas in the dining room, which was located directly over a small basement (about 12′ x 12′) in which a hot water heater was located. Access to the basement was provided by a stairway from the kitchen, which was adjacent to the dining room. There were three gas appliances in the house, the hot water heater in the basement, the kitchen stove, and a bathroom heater on the upstairs or second floor, all of which were served by L-P gas from a tank battery located outside the house.

In response to a telephone call or calls from Mrs. Campbell the gas company sent Powers, its service man, to check the trouble. Powers had passed the required examination and was licensed by the Department of Public Safety for the handling of L-P gas. Cf. KRS 234.185. He arrived at about 8:30 in the morning. Meanwhile, on the previous evening Meissner had disconnected the gas tank. According to Mrs.

Meissner, the first thing Powers did was to turn the gas back on and, after taking a quick look at the kitchen stove, he descended to the basement followed by the Meissners. Mrs. Campbell remained in the kitchen. The basement was lighted, but poorly so, by a drop cord and bulb, with a switch at the head of the stairs. Powers did not have a flashlight. Despite the dimness of light, Mrs. Meissner was able to observe that Powers put a liquid substance on the gas pipe leading into the water heater and that it appeared to bubble. Meanwhile, there was present in the basement a rubberized extension cord of the type ordinarily used by garage mechanics, with a protective cage over the bulb. In order to provide better lighting Meissner proceeded to connect this extension cord by plugging it into a three-way receptacle to which the bulb at the end of the drop cord also was attached. Immediately the light was much brighter, and Mrs. Meissner recalls having thought to herself, "I was not wrong—I did see bubbles." Just then she heard her husband scream, "Don't light!" and the explosion occurred. Though badly burned, she immediately ran upstairs and found her mother on the floor of the kitchen with her hair and clothing afire.

With respect to the interval between the time the extension light came on and the moment of the explosion, Mrs. Meissner had testified as follows in the course of a pretrial deposition taken while she was in the hospital:

Q— "How long was it after George got the light turned on before the explosion took place?"

A— "It seemed just an instant—didn't seem very long."

Q— "When George got the bright light, was it after that you were able to see the soapy substance Powers put on?"

A— "No, I didn't look after that. It seems like after he got the bright

light it was so quick I didn't see anything."

Testifying at the trial she said, "There was time enough for me to see and to hear my husband scream. I couldn't say how long that time was."

Aside from Mrs. Meissner's description of the events immediately prior to the accident there were two other items of evidence tending to prove that Powers caused the explosion by using a cigarette lighter. One of these was testimony by two physicians relating statements made by Powers while being treated by them, and the other was testimony by C. N. Scott (personal representative of the Exia Campbell and George Meissner estates) that on the next day (Sunday, June 10) after the explosion he found Powers' cigarette lighter on the basement floor near the water heater.

Subject to minor discrepancies in their respective accounts of the matter, Drs. T. J. Wright and H. I. Frisbie, operators of a private hospital in Stanford to which Powers was taken shortly after the accident, testified that while they were administering emergency treatment to him Powers volunteered the information that "I struck a light and the explosion happened—I never should have done it." Dr. Wright's impression was "that they were ready to test and that either he struck a match or light or whatever to check their work * * *. They were going to check the repair work to see if it was adequate." At the time, Powers was in a state of great shock and pain for which he had been given narcotics.

This case was tried twice, first in May of 1963 and then in March of 1964. For reasons not disclosed in the record, Drs. Wright and Frisbie did not testify at the first trial. Between the first and second trials a malpractice suit was brought against them, apparently in behalf of Powers' estate. That litigation had been settled at the time of the second trial, and what we have said here is all the information the jury had on that subject. Powers lived some 2½ months after the explosion, and according to his mother and father "he said he didn't know how it happened. He said it just happened so quick that he didn't really know how it happened." Ernest Murphy, a representative of the Gas Bureau of the Division of Fire Prevention of the Department of Public Safety, testified that in the course of an investigation conducted on the day of the explosion he interviewed Dr. Frisbie and that the doctor said "he felt that Mr. Powers didn't know how the accident occurred, that he didn't seem to know how it occurred." This evidence was admitted for the purpose of impeaching Dr. Frisbie, who had testified to a contrary effect.

The witness Scott went to a Lexington hospital to see Mrs. Campbell and the Meissners on the evening of June 9, 1962. While there he was asked to go to the Campbell home to secure some money Mrs. Campbell had in the house and to see if he could find in the basement Mr. Meissner's billfold containing $110. (Meissner's nylon clothing had burned almost completely from his body.) Mr. Scott performed these errands on the next morning, June 10. The billfold was found in a broken jug under the staircase leading from the basement to the kitchen. In the process of searching for it, Mr. Scott says he discovered a cigarette lighter "in plain view" on the basement floor 12 to 18 inches from the water heater. He tested it and found it to be in working order. He kept it for about a week and then turned it over to the plaintiffs' attorney, who sealed it in an envelope and put it in the bank for safekeeping. The lighter bore the initials "F C P" and was identified as belonging to Powers. A guard stationed outside the Campbell home testified that he heard Mr. Scott mention a lighter when he came out of the house after completing his mission there. On the other hand, the witness Murphy, who on June 9, the day before, had investigated the accident in behalf of the Department of Public Safety for the sole purpose of ascertaining, if possible, the source and cause of the explosion, testified

that in the course of carefully examining the basement area and the water heater he did not see the lighter. Mr. Murphy also took several flashbulb photographs of the heater and surrounding floor, and these exhibits do not show a cigarette lighter. However, as there was a good deal of debris on the floor, including a mass of rock wool pellets from the insulation over the water tank, it was quite possible for such an object not to have been noticed or to have been caught by the camera, though Mr. Scott says it was "in plain view."

. The witness Murphy qualified as an expert. Though conceding that the point of ignition "could have" been in the basement, he believed it was not. It was his opinion that the gas was ignited somewhere above ground, around the first floor of the house. He based this theory on a number of factors such as the direction of the explosion's force as evidenced by the effect on the furniture and the damage to the house, and the location and volume of debris in the basement. Moreover, since the heaviest concentration of third degree burns sustained by Powers was on the back of his body and arms, it seemed likely that the intense heat and main force of the explosion moved toward him from the rear.

The gas line from the tank battery located outside the house led to a "T" connection in the basement, and another line or lines ran from this connection to the appliances upstairs. The point from which the gas escaped was not conclusively established. But wherever the leak was, the case for the plaintiffs is pitched on the theory that the point of ignition was in the basement and that Powers caused the explosion by using his cigarette lighter. No other basis of negligence being suggested, our analysis is confined to that hypothesis.

Assuming for purposes of the argument that the explosion did originate in the basement, the case narrows down to the question of whether reasonable men must of necessity agree that Powers was the culprit. This brings us to the rest of the Murphy testimony. He said, and there is little doubt of it, that L-P gas is so highly volatile that it can be ignited by the action of an ordinary light switch. It will be recalled in this connection that Meissner plugged the extension cord into a receptacle at the end of the drop cord in the basement. Assuming that this action did not provide the fatal spark, there was further testimony by Murphy that at the point where the drop cord entered the head of the light socket the two wires were twisted, and that with a slight movement of the line (for example, from a pull on the extension cord) they could be exposed. If the two wires came into contact in this manner an arc or spark would have resulted.

To us, the most eloquent piece of defensive evidence in the record is the clothing worn by Powers at the time of the mishap. He had on a shirt and trousers. The trousers do not show any marks of fire. The back of the shirt is badly scorched all over, and in places burned through, whereas the front is scorched only partially and to a much lesser degree. Taking this exhibit in conjunction with the Murphy testimony, and without further evidence of an explanatory nature, we cannot avoid a healthy doubt that the explosion emanated from a point in front of Powers rather than behind and probably above him.

■ We need not decide whether, in the absence of the defensive evidence, the testimony produced by the plaintiffs established a rebuttable presumption or merely a permissive inference (that is, a right to go to the jury). Assuming that a rebuttable presumption had been created, entitling them to a directed verdict unless reduced to a less persuasive status, the question is whether the defensive evidence injected enough doubt that it would not have been unreasonable for a jury to remain unconvinced that Powers caused the explosion by igniting his cigarette lighter. Lee v. Tucker, Ky., 365 S.W.2d 849, 852 (1963). Without minimizing the closeness of the question, we think it did.

Mrs. Meissner was, of course, a party to the lawsuit and thus an interested witness. The jurors were not compelled to accept her version of the accident at full face value. And even if they did so accept it, and believed that Powers was about to strike his lighter when Meissner shouted "Don't light," it does not follow that Powers actually did strike it. It may be that he desisted, or that the explosion was sparked by the extension cord an instant before he was able to strike the lighter. Nor do we feel, under the rather peculiar and to some extent inadequately explained circumstances, that the jurors were compelled to believe the doctors. It must be remembered that the burden of persuasion remained with the plaintiffs at all times. A party not having the burden of proof is not required to adduce "substantial evidence" in support of his defense in order to avoid a directed verdict. It is only necessary that he muddy the water enough that it cannot be justly held that there is but one conclusion reasonable men could reach. Cf. Lee v. Tucker, supra.

The principle of "substantial evidence," cf. Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S.W.2d 877 (1940), applies to the party having the burden of proof. To hold that a defendant must produce "substantial evidence" in a case where the plaintiff's evidence, standing uncontradicted and unexplained, would entitle him to a directed verdict, would in effect shift the burden of proof, and we do not believe that is what this court intended to say in Haffler v. McKinney, 288 Ky. 782, 157 S.W.2d 92, 96 (1941), and Threlkeld v. Breaux Ballard, 296 Ky. 344, 177 S.W.2d 157, 161, 151 A.L.R. 708 (1944), cited by appellants in this case. As pointed out in Lee v. Tucker, supra, the burden never shifts. When, after the proof is all in, the plaintiff demands a directed verdict, the question becomes, "Could a reasonable man remain unconvinced?" In this case we must answer in the affirmative.

In closing, it should be mentioned that Powers' administrator asserted a counterclaim against Mrs. Campbell's estate for wrongful death on the theory that the accident was caused by Meissner while acting as Mrs. Campbell's servant. This claim fell victim to a directed verdict at the close of the evidence on the ground, inter alia, that there was insufficient proof of a master-servant relationship. Powers' administrator cross-appealed but did not submit a brief, so we assume the cross-appeal was abandoned. In any event, it seems obvious that the evidence was not sufficient to support the burden of proof that Meissner caused the accident.

The judgment is affirmed on the appeals and cross-appeal.